CENTRAL OF GEORGIA RAILWAY COMPANY v. HARPER, guardian.

1. When it is made to appear that a defendant in error has been formally adjudged insane since the signing of the bill of exceptions, the guardian appointed by the ordinary, under the Civil ,Code, § 2570 et seq., may be made a party to the record.

2. In a suit for personal injuries by an employee against a railroad company, a nonsuit should be refused unless the evidence reasonably leads to the conclusion that the plaintiff was negligent. The nonsuit was properly denied in this case.

3. When during the progress of a case a motion is made by the defendant to dismiss the case, based on the contention that the evidence adduced on the trial showed the plaintiff to be absolutely non compos mentis when the suit was filed and also at the time of the trial, and the evidence is not conclusive on the subject, it is proper for the court to refer this collateral issue of fact to the jury, under appropriate instructions.

4. In ruling on the motion to dismiss because of the mental incapacity of the plaintiff to sue without a next friend or guardian, the remarks of the judge, assigning his reason for the ruling and the reference of the issue thus raised to the jury, were neither expressions of opinion upon the facts nor upon the credibility of the plaintiff who had testified as a witness.

5. In his charge the judge recognized that the statute regulating the checking of the speed of trains at public crossings would not be applicable to a train started at or upon a public crossing, and submitted the issue of fact as to distance from the starting point of the train to the public-road crossing, with the instruction that if the distance was so short that the statutory requirement could not be met, the statute would not apply. This charge was adjusted to the facts of the case and was not error.

6. The verdict was not excessive, and was warranted by the evidence.

Argued November 14, 1905.—Decided February 16, 1906.

Action for damages. Before Judge Norwood. City court of Savannah. July 21, 1905.

*Lawton & Cunningham,* for plaintiff in error.

*Arnold & Arnold* and *Osborne & Lawrence,* contra.

EVANS, J. A suit for damages was instituted in the name of R. L. Harper against the Central of Georgia Railway Company, he having sustained a personal injury while in its service in the capacity of "order clerk." It appears from the petition, that he had duties to perform in the company's general yard-office at Savannah, being employed to carry messages and to do like service, but having no connection whatever with the operation of trains. Several tracks belonging to the company cross Bay street. On one side of this crossing is located its general yard-office, while on the opposite side is a smaller building, also used as an office. On the night of September 27, 1904, Harper, who was subject to the orders of the trainmaster, was directed to go from this building to the general yard-office for the purpose of there using a telephone and procuring certain information with reference to the handling of cars. He started to cross the Bay street crossing, and while undertaking to do so was run over and seriously injured by a switch-engine, which he alleges did not have a proper headlight, and which crept noiselessly upon him in the dark before he was aware of its presence. He further complains, that the company's watchman at the crossing negligently failed to take any steps to protect him; that the employees in charge of the engine failed to check it as it approached the crossing, or to give any signal of its approach, or to maintain a proper lookout; that the engine was run at a speed of from twelve to fifteen miles an hour, in violation of a city ordinance; that an employee on the footboard of the engine observed his perilous situation on the crossing, but wantonly failed to take any measure to save him; and that after he was stricken, the company's servants continued to move the engine, and he was dragged some forty or fifty feet, notwithstanding the engine could have been stopped within a much shorter distance. He alleged that as a result of the injuries received his mental functions had been greatly impaired. The truth of this allegation was shown at the trial by the testimony of physicians who had attended him since his injury. Upon this testimony, as well as upon that of Harper himself and his general appearance and conduct in court, the defendant com-

pany based a motion to dismiss the case on the ground that he was non compos mentis and without legal capacity to maintain his suit, and upon the further ground that this mental condition existed at the time suit was instituted, and he therefore did not have legal capacity to sue. The court overruled this motion, holding that if Harper had become insane after filing the suit, this would afford no cause for dismissing the action, since it could be prosecuted by a guardian ad litem appointed to represent him in the litigation; and that the evidence adduced touching his mental capacity at the time the suit was brought was not such as to authorize the court to say, as matter of law, that he was at that time non compos mentis, the evidence in this regard presenting a question of fact which could only be determined by a jury. The defendant also made a motion for a nonsuit, but it was overruled by the court; and the jury, after both sides had announced closed and the case was submitted to them for consideration, returned a verdict in favor of the plaintiff for $15,000. The company thereupon made a motion for a new trial, upon the ground that the verdict was excessive and without evidence to support it, and also upon other grounds, presenting the complaint that the charge to the jury was in certain particulars inapt, and that the presiding judge, in announcing his ruling on the motion to dismiss the case, made use of language in the presence of the jury which was calculated to work to the defendant's prejudice. The motion for a new trial was overruled, and the case was brought to this court by a bill of exceptions sued out in behalf of the railway company.

1. The motion for a new trial was heard and disposed of in the trial court on July 21, 1905. On July 31, Harper was formally adjudged insane, in the court of ordinary of Chatham county, and committed to the State Sanitarium. The bill of exceptions in this case was certified on July 24. Subsequently, upon a petition presented to the trial court by counsel for Harper, the defendant in error, the judge of that court passed an order, dated November 14, 1905, appointing Mrs. Myrtle Harper, who appeared as his wife and next friend, as his guardian ad litem to represent him in the further progress of the litigation, it having been made to appear to the court that he had been adjudged insane before the court of ordinary. Upon this showing, counsel for the railway company, on the call of the case in this court, made a motion to have Mrs.

Harper substituted as a party defendant to the writ of error, as the legal representative of her husband and in his stead. This motion was taken under advisement by this court, and argument was heard upon the merits of the case. The court afterwards passed an order granting leave to the plaintiff in error to proceed to have a guardian of the property of Harper appointed according to law, and to make such guardian, when appointed, a party defendant. Proper steps were taken by counsel to comply with the terms of this order, and Mrs. Harper, after being regularly appointed guardian of the property of her husband, was allowed, as such, to become a party to the case.

2. When the plaintiff closed his evidence the defendant moved the court to nonsuit the case, which motion was refused. The evidence submitted by the plaintiff tended to show that he was employed by the defendant company as a clerk in its yard-office in Savannah. He worked in the yardmaster's office under the superintendency of Mr. Champion. On Bay street near the yard was the general yardmaster's office. Between these two offices were several yard tracks, running north and south, which intersected Bay street, and Bay street at this point was a public-road crossing. There was an electric light a little below the crossing. On the night of the injury the plaintiff was ordered by his superior officer to go to the general yardmaster's office and send a telephone message. The plaintiff testified that just before he started over the crossing he looked down the tracks and neither saw nor heard any train or engine. There was no obstruction to prevent him from seeing up and down the tracks. While on the public-road crossing and in the act of passing over the last track, he was struck by an engine and dragged to a point beyond the crossing. He had good hearing and sight at the time, but neither heard any bell nor saw a headlight. He received several injuries, the nature of which was described in the testimony of the surgeons who had treated his wounds. Plaintiff's age, physical condition, and earning capacity at the time of receiving the injuries were proved.

The plaintiff's employment related to the movement of the trains in the yards of the railroad company, and the trial judge properly treated him as a coemployee relatively to the employees in charge of the train which inflicted the injury. Being an employee, it was incumbent on him to prove either that he was free

from negligence or that the servants or agents of the railroad company were negligent, before he could recover for the injury. *Central R. Co.* v. *Nash,* 81 *Ga.* 584. The measure of diligence exacted by the law of this plaintiff was the exercise of that care which a prudent man should have observed under like conditions and circumstances. *Central R. Co.* v. *McClifford,* 120 *Ga.* 90. Unless the evidence reasonably leads to the conclusion that the plaintiff was negligent, the case should go to the jury. The question of negligence belongs particularly to the jury, and except in a clear case, where there is no conflicting evidence, the court should not withhold the case from the jury by awarding a nonsuit. Where the evidence upon this point is doubtful, it should be submitted to the jury, and to grant a nonsuit is error. 4 Michie's Enc. Dig. Ga. Rep. 556; *Steinhauser* v. *Ry. Co.,* 118 *Ga.* 195. When the plaintiff approached this series of tracks for the purpose of crossing, he surveyed the situation, looked up and down the tracks, and there was no appearance of danger within the range of his vision. He was upon a public street, which the engineer of an approaching train was forbidden by law to cross except with his engine under control and with warning signal from the engine bell. The plaintiff was an active, robust man who had worked for a year in the employment in which he was engaged at the time of receiving the injury. From a consideration of these facts could it be said, as a matter of law, that the conduct of the plaintiff would amount to negligence? I apprehend not. If the evidence does not clearly demonstrate negligence, then the court did right in refusing a nonsuit. In a recent case it was held to be error to charge the jury that the failure of the plaintiff to stop, look, and listen before going on a railroad track was such negligence as to defeat a recovery. *Columbus R. Co.* v. *Peddy,* 120 *Ga.* 589. It was for the jury to say whether proper prudence would have required the plaintiff to look up and down each track as he approached it, and whether the lookout for trains which the plaintiff observed immediately before passing over the first track showed proper diligence. Photographs of the scene of the injury, which were introduced on the trial below and which appear in the record before us, disclose that the distance across the tracks at the Bay-street crossing was short; that the view up and down the tracks was unobstructed, the country being level, and there being along or upon the right of way no structures which

cut off the range of vision of one standing upon the side of the crossing from which the plaintiff testified he started after looking up and down the railway tracks and seeing no engine or train within sight or hearing.

3. During the progress of the trial and after the defendant had introduced in evidence two of its witnesses, the defendant made a written motion to dismiss the case, on the ground that it affirmatively appeared from the evidence that the plaintiff was non compos mentis and not possessed of sufficient capacity to bring or maintain a suit, and that it appeared from the evidence that this condition existed not only at the time the suit was brought but also at the time of the trial. This motion was denied by the court. At the time of bringing the suit the plaintiff had not been legally adjudged a lunatic. If in point of fact he was a lunatic, the suit could have been instituted by some competent person as his next friend. *Reese* v. *Reese,* 89 *Ga.* 645. Admitting for the sake of the argument that one absolutely non compos mentis could not prosecute a suit except by next friend, where there has been no adjudication of insanity, let us inquire whether there was any error in the ruling complained of. Every person is presumed sane until the contrary is made to appear. The question of sanity or insanity is one of fact. *Hunt* v. *Formby,* 43 *Ga.* 87. A plaintiff with an impaired or weak mind, with capacity to understand the nature of a particular cause of action, and with will enough to desire to bring suit thereon, may do so without a next friend or guardian. *Calhoun* v. *Mosley,* 114 *Ga.* 641. While both the physicians who testified pronounced the plaintiff non compos mentis, it is evident from their testimony that this term was used by them in contradistinction to a normal mental condition in every respect. One of these witnesses said the plaintiff after his injury would not allow any clothes to remain on him at all and imagined several foolish things, such as cutting off little nigger heads and putting them in a bottle; he would drink nothing but a patented preparation called vitogen, and would persist in wearing a clamp on his nose. This same witness also testified that he did not think the plaintiff's mind so weak that anybody could impose on him; that as to some things he seemed to be perfectly rational, but as to others he was not. "Outside of one or two things he seems to be at himself." "I have found him able to remember incidents which have hap-

pened,—he seems to know. I do not see any reason why he should not be accurate upon other subjects." The other physician testified that the plaintiff was afflicted with amnesic aphasia—forgetfulness of words,—which had no relation to any hallucination; that paralysis of his tongue made his articulation less distinct. The plaintiff testified before the jury; he gave intelligent responses to questions propounded, and a rational and connected narrative of the circumstances attending his injury. He was called on to explain a diagram purporting to represent the scene of his collision with the engine; he pointed out what he considered an inaccuracy in the diagram. The plaintiff was partially paralyzed and the injury to the brain made it difficult for him to readily find words with which to express his meaning. The jury saw the plaintiff, observed his manner of testifying, heard the opinion of expert witnesses as to his mental condition, and the court pursued the proper course in refusing to determine this collateral issue of fact. The mental capacity of the plaintiff to bring and maintain his suit was referred to the jury under an instruction concerning which no complaint is made.

4. In ruling on the motion to dismiss the case because of the mental capacity of the plaintiff, the court made these remarks in the presence of the jury: "The difficulty about the motion is that it is one of law addressed to the court on a matter of fact. There is no testimony by which it appears judicially that he was a lunatic. Every man is presumed to be sane until the contrary appears, and that very frequently appears judicially by a proceeding to show the man is insane. We very frequently say men are insane, when it is a matter of opinion, general consensus of the public. When we say a man is insane, it is received as evidence of his insanity, as matter of public opinion; but in this case there was no judicial determination of that question before this suit was brought, nor do I remember that there was any evidence elicited to show that at the time this suit was brought these physicians said that he was non compos mentis. They state, generally, he is non compos mentis. I did not understand that he was non compos mentis from the time that he received this injury up to this date; so that I would have to infer as a legal proposition that he was non compos mentis at the time he brought this suit, and, therefore, incapable of appearing in court in propria persona. It not appearing affirm-

atively that he was so at the time he brought this suit, the question comes up, it seems to me, upon a motion to dismiss the suit, that the man since the bringing of the suit has become non compos mentis. That motion would not prevail, because it would be the duty of the court, if a man was sane at the time he brought his suit and had become insane since, to appoint a guardian ad litem and let the case proceed. Now, as to whether the evidence shows that he is incapable of bringing suit, as I said a while ago, there are men who are insane on certain subjects and perfectly sane upon others. The books are full of instances of that kind, and some have come within my own experience. There was a man who came down here twenty odd years ago from the north, named Bell; he went out here in Liberty county and he stirred the negroes up out there by proclaiming himself as Jesus Christ; he broke up two negro congregations; they followed him, and he insisted that he was Jesus Christ. I was employed to prosecute him as a vagrant,— could not make that out, because the only evidence was that he was not doing any work and the negroes were supporting him. He was just in the position of a great many other preachers—was supported by the congregation—and we had to take out a writ of lunacy. I conversed with him and he was perfectly sane upon any other subject, knew more about the Bible than any man I ever saw; he could quote it from one end to the other; if you gave him a text, in a few seconds he would turn to the text in the book; but he was absolutely wild on the subject that he was Jesus Christ. A case of a witness who was brought to testify that another man was insane, and went on in a perfectly rational manner as to proving that the man was insane because that man had claimed that he was Jesus Christ, and he demonstrated to the satisfaction of the court and jury that the man was absolutely insane; finally, one of the jurors said, 'Well, why do you say that he is insane?' 'He says that he is Jesus Christ, and I say it because I am Jesus Christ myself.' That was his hallucination, but perfectly rational upon other subjects. Now, this man has evidently a hallucination about the negro children and one or two other things. But I can not say, there being no evidence of this fact until this trial, that he was so insane that he could not bring a suit, when the physicians testified that he is rational, his memory is good upon other subjects and in narrating events that occurred before this transaction took place;

and therefore it is not, it seems to me, a legal question that I can pass on, and that it would be more a matter of argument to the jury by counsel to show from the facts of the case that this man was incapable of making a correct statement; that he must be wrong in his statement to the jury in the facts of the case, for the reason that his mind was so far impaired that he is incapable of making a correct statement. It seems to me it would be more a matter for the jury than a question of law for me to determine that the man is absolutely incapable of making a contract, there being no evidence elicited · upon the subject, and no evidence elicited that at the time he brought this suit he was non compos mentis. So I will have to overrule the motion." The plaintiff in error complains that this language was an expression of opinion upon the facts of the case and the credibility of the plaintiff, who had testified as a witness. The statute forbids a judge to express or intimate his opinion as to what has been proved. Civil Code, §4334. But when an objection is made to evidence offered, the judge has a right if he deems proper to give the reasons for his decision on the objections, and such reasons so given, if pertinent to the objection made, do not constitute such an expression of opinion as to violate the code section above cited. *Oliveros* v. *State,* 120 *Ga.* 242; *Perry* v. *Butt,* 14 *Ga.* 699. The judge was asked to dismiss the case because it was contended by the movant that under the evidence the right of the plaintiff to bring and maintain his case was a question of law for decision by the court. The judge ruled that the question was one of fact for the jury, and gave the reasons which impelled him to this conclusion. We do not think the remarks of the court open to the criticism made on them.

5. The 2d, 3d, and 4th grounds of the amended motion complain that the evidence did not warrant a charge on Civil Code, §2224, in reference to the checking of speed and ringing of the bell in approaching a public-road crossing; it being the movant's contention that the uncontradicted evidence showed that the engine started at a point so near the crossing as to make it impossible to comply with the law in this respect and to reach the crossing. And if such a charge was proper, movant further contends, the jury should have been instructed that the duty to check and keep checking would not apply if the engine started toward the crossing at a

point so close as to make it impracticable to comply with the statute as to checking and continuing to check and yet reach the crossing. The plaintiff located the place of receiving his injuries on Bay street, a public-road crossing. The defendant's witnesses varied in locating the place from whence the engine started just before striking the plaintiff. The engineer testified: "I suppose I was just about a car length, 25 or 30 feet, from the crossing when I started in the direction of the crossing; maybe not this far." The conductor testified: "Immediately before the accident happened, my train started from five or six car lengths north of Bay-street crossing. I remember the fact because I know how many car lengths it was from the crossing to where the engine was standing." The fireman fixed the distance from five to six car lengths, and testified that cars vary in length from thirty-six to forty feet. With this evidence in mind the court charged the jury as follows: "On that point I charge you, at the same time, that while that is true, that the law is that the engineer must check and keep checking as he approaches a public crossing, that that is modified in this way, according to the facts of the case; if the train should be approaching the crossing after stopping at a point so close to the crossing that it was not practical before reaching the crossing for it to comply with the statute as to checking and continuing to check the train, then the force of that statute would not apply." This excerpt from the charge fully recognized the principle stated in *Harris* v. *Central R. Co.,* 78 *Ga.* 535, that the statute does not require that a train started at or upon a public crossing shall be checked and kept checked while passing over that crossing. Under the defendant's evidence the jury could have found that the engine started as far as 240 feet from the crossing; and the court left it for the jury to determine if the distance was such as to make the requirement of the statute as to checking and continuing to check the train on approaching the crossing applicable, with the instruction that if the distance was so short that the statutory requirement could not be met, the statute would not apply. None of these grounds is meritorious.

6. As to the correctness of the verdict. The plaintiff's testimony made out a prima facie case for a recovery. The witnesses for the defendant contradicted him in important particulars; but in many respects they were inharmonious with each other. It was

the jury's prerogative to accept the plaintiff's version. The testimony of both physicians was that the plaintiff was a permanent physical wreck, his tongue was paralyzed, and his mental faculties greatly impaired. Indeed, since the trial the plaintiff became so violent that confinement in the State Sanitarium was necessary. At the time of his injury he was 33 years old and was earning $65 per month. The verdict was large, but was not unwarranted. The presiding judge was satisfied with the amount and we see no reason for disturbing the verdict.

*Judgment affirmed. All the Justices concur, except Atkinson, J., not presiding.*