## 5704.  GLOVER *v.* THE STATE.

1. The evidence for the State as to the commission of the alleged adultery was wholly circumstantial, and failed to exclude every other reasonable hypothesis than that of the guilt of.the accused.
2. Since adultery is necessarily a joint offense, one on trial for that offense may introduce proof of the good character of the other alleged participant.
3. In the trial of a criminal case counsel may read to the jury, in the presence of tlie court, opinions of courts of last resort which are germane to the case on trial, and, in so doing, may read facts stated in the opinion when a recital of the facts is necessary to make clear the principle; and

the court has power to confine counsel to what is proper and applicable.

4. Whether the flight of the defendant on the approach of a third person was prompted by consciousness of guilt, or by other reasons, was a question for the jury to determine; and an instruction to them on this subject was proper.

5. A witness may testify that another person appeared to be embarrassed, without always stating the evidences thereof, which may be indescribable.

6. On cross-examination it is always permissible to sift the motives of the witness and to show, if possible, any reason other than a purpose to tell the truth, which may consciously or unconsciously actuate him in his testimony.

DECIDED AUGUST 22, 1914.

Indictment for adultery; from Forsyth superior court—Judge Patterson. April 27, 1914.

Gordon Glover, a married man, was convicted of adultery, alleged to have been committed with Ettie Densmore, a married woman. The entire evidence adduced on the trial, as set forth in the brief of evidence, is as follows: Mrs. M. J. Gilbert, in behalf of the State, testified: "I am acquainted with Gordon Glover and Ettie Densmore. I live in Forsyth county, and I have lived in the county nearly all my life. Gordon Glover is a married man. Ettie Densmore is a married woman. In April, 1913, Ettie Densmore lived with her husband on my husband's place, in Forsyth county. They lived in a tenant house about 75 yards from where we lived. One afternoon, the 23d of April, Ettie Densmore was at my house and I saw a man passing along the road between my house and her house, and she said 'That is my brother Jim,' and she took her baby and started home. She was in a right smart hurry to get off. She followed on to her house. Her husband was working for my husband and with him in the field. Her husband was plowing, and, before he left the house in the afternoon to go to the field, I heard him tell her to bring him some water after a while, and when I saw her go home (as I thought, to be with her brother Jim) I carried the water to the field and came back around through the pasture, by her house, thinking that I would spend the rest of the afternoon with her. I came up behind an old smoke-house which was in the yard, at her place. When I got in about ten steps of the old smoke-house, I heard her little child, who was standing in front of the smoke-house, say: 'Ma, yonder comes Gilbert.' That is what the child called me. Then I heard the smoke-house door fly open. It flew back against an old ladder that was standing there, and I saw Gordon Glover run out of the smoke-house, and he trotted off

out to the road and left. I came around in front of the smoke-house, and Ettie came out of the smoke-house. She looked mightily embarrassed, and stammered and couldn't hardly talk, and I said, 'Thought it was your brother Jim,' and she said 'I thought it was Jim.' She had locks of cotton in her hair, on the back of her head. There was cotton—seed-cotton—in the old smoke-house, twelve or fourteen hundred pounds in a pile. The cotton in the smoke-house was mashed down and packed, like some one had laid on it. When Ettie Densmore left my house to come home that evening it was about one o'clock. We both thought that the man passing, going to her house, was her brother Jim. It was about an hour from the time she went home until I came from the field up to her house, by the old smoke-house, and saw her and Gordon Glover. Her husband was plowing in plain view of her home. When I approached the old smoke-house and heard the door fly open, I was about ten steps on the south side of the smoke-house from the door, the door was in the west end of the smoke-house. Gordon came out and went off kind of by me. The well was out in the yard, just beyond the smoke-house from me. She stammered naturally."

Ettie Densmore, in behalf of the defendant, testified: "I know Gordon Glover, and I know Mrs. M. J. Gilbert. My husband is Arbin Densmore. We lived on Gilbert's place in April last year. Our house was right close to Gilbert's house. I remember the day that Gordon Glover came to our house. I had started to the field with some water to my husband where he was plowing. Mrs. Gilbert called me and told me that brother Jim was going to my house, and I looked around and saw the man going that way, and I picked up my baby and went back to see him. When I got there I found it was Gordon Glover. Gordon went to the well and drew a bucket of water, and got him a drink. I went out there where he was. He asked me if Arbin was hired to Mr. Gilbert by the day to plow, and I told him that he was. My husband, on the Sunday before, had invited Gordon to come over that week and take a hunt. Gordon said that if my husband was hired by the day he guessed he wouldn't stop work to go hunting, and that he would go on back. He did not go down to the field where my husband was. He did not stay there more than two minutes. When he left I went to the field and carried the water to my husband. My husband was in plain view of us all the time, and could see everything about the

place, from where he was at work. Gordon did not go in the old smoke-house, nor did I go in there. There was some seed-cotton in the old smoke-house, which we had picked out for Mr. Gilbert during the winter after we had moved on the place, about the first of January. I was not in that smoke-house with Gordon Glover that day or any other day. Mrs. Gilbert did not come down there that afternoon and catch me and Gordon Glover in that smoke-house. She never saw anything wrong with me in her life, with Gordon Glover or with any other man. She got mad at me and is mad now, and she is doing this just for spite. As soon as she got mad and told this on me we left their place. My husband and I live on Mr. Allen's place, and have lived there since then. My little child, that was with me that day, was only about two years old and could talk very little."

The defendant, Gordon Glover, made the following statement at the trial: "On a Sunday, last April, Arbin Densmore told me to come over to his house one day the next week, and we would take a hunt. One day, just after dinner, I went over there. When I got there he was in the field, plowing for Mr. Gilbert. I went up to the well and drew a bucket of water, and his wife came out to the well and I asked her if Arbin was plowing for Mr. Gilbert by the day. She said he was, and I told her that 'I guessed that it would not suit him to stop,' so I did not bother. I stayed there about two minutes, took a drink of water, and went off. He was in plain view of the house and me all the time. I did not have anything to do with his wife, Ettie Densmore, except to talk to her the minute or two that I was there. I did not go in the smoke-house by myself or with her, and it is not true that anything wrong took place between us there that day. I did not see Mrs. Gilbert there at all. She did not catch us there in the smoke-house."

Berry Gilbert, in rebuttal, testified: "I heard about this trouble with Gordon Glover and Ettie Densmore the day it occurred. I was working in the field with Arbin Densmore. I was trimming off terraces and ditches, and he was plowing. My wife brought us water that afternoon. I did not see Ettie Densmore in the field that afternoon. She did not come in the field. I was with her husband all the afternoon. She was at my house when I went from the field. Arbin's house and place is in plain view of the field where we were at work. I did not see Gordon Glover that afternoon. I

saw some man pass back through the field, who I thought was Gus Glover, Gordon's father. The house where Arbin Densmore lived was near my house. His house and yard and old smoke-house were all in plain view of my house; anybody at my house could see the people in and about his house and place. That afternoon my wife and my grown daughter were at my house."

Glover made a motion for a new trial on the general grounds that the verdict was without evidence to support it, etc., and on several special grounds; the motion was overruled, and he excepted.

*J. P. Brooke,* for plaintiff in error.

*Herbert Clay, solicitor-general,* contra.

WADE, J. (After stating the foregoing facts.) 1. It appears to us that the evidence was not sufficient to exclude every reasonable hypothesis inconsistent with the guilt of the accused. The evidence for the State might raise a very strong suspicion that the crime of adultery was at least in contemplation by the parties charged therewith, but, on the other hand, it is just as reasonable to conclude from that evidence that the crime was not actually consummated, and that Mrs. Gilbert's arrival on the scene interrupted and prevented the criminal act. While, from an ethical standpoint, a mutual agreement of a married man and a married woman to have illicit intercourse would make each as guilty morally as if this intention were physically consummated, the law is constrained to deal only with actual overt acts in such matters, and, unless sexual intercourse actually occurred, neither of the parties could be punished under a statute penalizing adultery. As was said in the case of *Long* v. *State,* 5 *Ga. App.* 176 (62 S. E. 211) : "The circumstances are such as to raise, perhaps, a violent suspicion; but this is all. From the proved facts the inference is as likely that the parties were about to commit the offense alleged in the accusation, and were prevented by the arrival of [another person] as that the act had already been consummated." In this case, while the impress on the pile of seed-cotton in the smoke-house is suggestive, and the facts that locks of seed-cotton were entangled in Mrs. Densmore's hair on the back of her head, and that the defendant Glover came hurriedly out of the smoke-house and went rapidly away without a word of explanation or even of salutation, and the embarrassment displayed by Mrs. Densmore, all excite a lively supposition as to the purpose which had drawn the pair into the smoke-

house and caused the closing of the door, still it does not appear how long these parties had remained in the smoke-house, and for aught the evidence discloses, they may have just entered it the moment before the welcoming call of the little child to Mrs. Gilbert alarmed them and caused them both to come forth; and there is no proof of bad character of the woman, to give rise to any inference of improper conduct on this occasion.

Mrs. Gilbert testified that she approached the building from behind the smoke-house, and could not testify that the parties accused were both in that house during any specific length of time. From her evidence the parties may or may not have consummated the crime of adultery before she arrived at the smoke-house; the one conclusion is just as reasonable as the other; and since the conviction depended on the circumstances proved, and those circumstances are susceptible of two explanations, equally reasonable, the conviction should have been set aside on the general grounds of the motion for a new trial.

2. In the 4th and 5th grounds of the motion for a new trial it is complained that the court erred in refusing to allow the defendant to submit evidence tending to show the good character of Ettie Densmore, the woman with whom he was charged with having had illicit sexual intercourse. His counsel stated to the court that he expected to prove by the witness offered that Ettie Densmore was a woman of good moral character, and that her character for virtue and chastity was good. In overruling these grounds of the motion the judge explained that he "stated to and in the presence of the jury at the time [when this evidence was offered] that the law presumed she was of good character, and that they should so consider it in making their finding, unless the State should introduce some one and show it was not good."

The crime of adultery is one which necessarily involves two persons, and where the character of one of these persons can be shown to be of such exemplary purity or loftiness as reasonably to preclude the supposition that he or she would consent to participate in so base an infraction of marital faith and of the law, human and divine, any impartial jury, when apprised of such character, would unhesitatingly declare against the guilt of the other party. Suppose the testimony proposed by counsel for the defendant had been admitted by the court, and had demonstrated overwhelmingly, and

4

without any conflict or dispute, that the woman in the case was of previously spotless reputation, of deeply religious temperament, a devoted wife and mother, whose aim in life was obviously to minister to the afflicted, care for the helpless, and uplift poor humanity to the utmost extent of her power, and whose soul was attuned to all of good we know, her hopes fixed upon the final reward which the "Giver of all good and perfect gifts" can alone bestow, how could it for a moment be imagined that any jury would accept evidence, less than overwhelming direct testimony from the highest sources, going to show that she was guilty of so low a crime with any man, no matter who or what he might be, how attractive his personality, or what the circumstances, and convict the defendant thereon—since adultery necessarily involves consent on the part of *both* persons committing the crime? We illustrate by an extreme case, it is true, but even where the woman with whom the man is charged with having had unlawful intercourse can be shown simply to be a woman of established virtue, to that extent, or for whatever it may be worth to the jury, such proof would tend to negative or dispute testimony showing that the man accused was guilty with her. Since the very nature of the crime of adultery requires that two must be guilty if either be guilty, evidence which tends to show to the satisfaction of the jury that one of the parties is incapable of committing the particular crime, and therefore is innocent, would also tend to establish the innocence of the other.

We are of course aware of the usual rule that the character of one accused of crime can not be put in evidence by the State, and, unless he himself makes the issue, he can not be attacked on account of such character. Also we have in mind the rule the Supreme Court of this State has laid down in *Lewis* v. *State,* 89 *Ga.* 396 (15 S. E. 489), that in a trial for seduction it is not competent for the State to show that the family of the female alleged to have been seduced were of good character and standing in the community, or that even the character of the female herself was good, except in rebuttal of evidence tending to impeach her chastity or veracity. Nevertheless, while we find no definite authority in this State for the rule which we now announce, it seems to us to be good law that the accused shall be permitted to prove, if he can do so, that the woman with whom he is charged with having had adulterous intercourse is one whose well-established character is such as to refute the charge. In Commonwealth *v.* Gray, 129 Mass. 474 (37 Am. R. 378), the

court says: "In this case the precise question presented by the exception under consideration is whether evidence of the character or reputation for chastity of the person with whom the adultery of the defendant is alleged to have been committed is admissible. It is quite true that legally her character or reputation is not in issue. No judgment upon this indictment can affect either her or her reputation; and in no proceeding against her would a judgment upon this indictment be admissible in evidence. Still her character or reputation may be a material fact, and so evidence upon it be competent and material. There can be no doubt that, upon an indictment for adultery, the defendant may be convicted upon evidence wholly circumstantial; and, from the nature of the offense, it commonly happens that the act is finally inferred from circumstances, which circumstances may have in themselves very direct or only indirect bearing upon the issue. Suppose, in a case depending upon circumstantial testimony, the government should offer evidence that the defendant, a married man, was seen at a late hour of the night to accompany a common prostitute to a house of ill fame, and was seen to leave that house early the next morning, it is quite apparent that not only the time, both at night and at morning, but the reputation both of the woman and the house, would be important and material, and evidence would be admissible upon each one of them; but neither of them is a fact which the judgment upon the indictment could in any mode affect, or in relation to which the judgment would be evidence. And so in relation to the character of the person with whom the adultery is alleged to have been committed; the judgment could indeed have no effect upon her, but her character is so connected with and so contributing to her identity that it becomes as really one of the necessary surrounding circumstances as any fact in the case. At any time, upon a charge of adultery, the government, after showing the defendant's presence under suspicious circumstances with a woman, may show that that woman is a prostitute; and it would seem to be reversing the humane maxim of the law to permit the government to prove as an independent fact the bad character of a woman in support of an issue, and to deny to the defendant the right to introduce evidence upon the same subject upon the same issue."

The statement of the court to the jury, as to the presumption that the woman Ettie Densmore was a woman of good character,

would by no means equal, in value to the defendant, proof by witnesses, possibly known to the jury to be reputable, that she was a person of good repute for chastity, and of the highest character in every way. So, under our view, the refusal to admit this testimony was error.

3. In the 6th ground of the motion for a new trial it is contended that the court erred in refusing to allow counsel for the accused to read before the jury a part of the opinion from the Court of Appeals of Georgia, in the case of *Long* v. *State,* supra, set out in this ground of the motion. The judge certified, in approving this ground, that he refused to allow counsel to read the facts in that case to the jury, but expressly stated to him that he "might argue the law of it to them." On the trial of civil cases, decisions of courts of last resort, and especially comments contained therein upon the facts of cases, should not be read by counsel to the jury. "Such a practice can not aid the jury in ascertaining the law applicable, for this they must take from the court; nor in arriving at the truth of the case on the facts, for this they must get from the evidence." *Hudson* v. *Hudson,* 90 *Ga.* 582 (3) (16 S. E. 350); *Central Railway Co.* v. *Hardin,* 114 *Ga.* 548 (40 S. E. 738). The rule is, however, quite different in criminal trials. That rule is concisely stated in *McMath* v. *State,* 55 *Ga.* 304, 305 (8): "Upon the trial of criminal cases, counsel, in their argument, may read law to the jury in the hearing of the court, subject to the correction of the court in its charge." See also *Warmock* v. *State,* 56 *Ga.* 503. "Of course, for the purpose of making the application, it is frequently necessary to read the facts stated in the opinion or contained in the report; and wherever they are read for the purpose of making clear the principle decided, it is entirely proper to read them, as well as the opinion." *Cribb* v. *State,* 118 *Ga.* 316, 319 (45 S. E. 396, 397). See also *Wiggins* v. *State,* 101 *Ga.* 502, 511 (29 S. E. 26). In the present case the excerpt from the opinion which counsel attempted to read to the jury was germane to the case on trial, and the recital of the facts set out therein was necessary to make the opinion intelligible; and counsel should have been permitted to read the excerpt.

The Supreme Court, it is true, held in *Solomon* v. *State,* 100 *Ga.* 81 (25 S. E. 87), that "While it is the right of counsel for the accused in a criminal case to read law to the jury and comment

thereon, this court will not control the discretion of the trial judge in refusing to allow counsel to read from a Supreme Court report of this State the facts of a decided case for the purpose of commenting upon and comparing the testimony in that case with the facts of the case on trial." In the present case, however, it does not appear that there was any attempt or intention to read the facts of the *Long* case, except in so far as necessary to make the opinion intelligible to the jury. In the case of *Clark* v. *State, 8 Ga. App.* 757 (70 S. E. 90), it was ruled that in a criminal case counsel for the accused has the right to read to the jury law applicable to the case, though the judge has power, in the exercise of his discretion, "to prevent counsel from reading to the jury, in such a way as to confuse them, law not applicable to the case or to the point in issue, read as law to the jury."

and that, therefore, the court may limit counsel in what he may

4. In the 7th ground of the motion for a new trial it is complained that the court erred in charging the jury as follows: "Flight, if any, if proven, from which the inference of consciousness of guilt may be drawn, may be considered by the jury. But flight is subject to explanation. The weight to be given it, or whether the jury will draw an inference of consciousness of guilt or not, is for the jury, it is for the jury to determine whether the flight of the defendant was due to a scare of guilt or to other reasons, if from other reasons no inference hurtful to defendant must be drawn by the jury." This charge was objected to because it was not authorized by the facts and because its effect was to emphasize unduly the testimony of Mrs. Gilbert that the defendant "trotted off" when she arrived on the scene. In *Grant* v. *State, 122 Ga.* 740 (50 S. E. 946), the court quoted with approval the following from People *v.* Welsh, 63 Cal. 167, 168: "The intention, like the act, may be proved by direct or indirect evidence of the circumstances connected with the crime. Hence the conduct of a party before and after the principal fact in issue is admissible, not as a part of the res gestæ, but as a circumstance connected with the act indicating the guilty intent." And in the *Grant* case, supra, the court held: "It would be for the jury to determine whether the flight of the defendant upon seeing the policeman who had interrupted the game of cards was due to a sense of guilt or to other reasons." While the instructions to which exception is taken in

this ground of the motion for a new trial may somewhat emphasize the particular evidence referred to, we do not think they were so argumentative or so unduly stressed that evidence as to demand a grant of a new trial.

5.   The 8th ground of the motion for a new trial complains that the court refused to rule out the evidence of Mrs. Gilbert that Mrs. Densmore "looked mightily embarrassed." We see no error in admitting this testimony, nor do we think the testimony amounted legally to a mere conclusion of the witness. It would be well-nigh impossible for one testifying that another appeared to be. "embarrassed," or "confused," or "disturbed," or "excited," or "alarmed," to give in every instance, or perhaps in most instances, all, or in some cases *any,* of the indicia or outward manifestations of the emotion testified about, though the witness might have absolutely no doubt as to the existence of the emotion, and his testimony might be entirely correct. While, in a sense perhaps, the testimony would express a conclusion on the part of the witness, in another sense the witness would be testifying to what was in effect a fact, impressed upon the mind of the witness by countless previous observations and experiences concerning the outward manifestation or expression of the emotion testified about, to be often observed from the features, manner, or slightest movement of another. A flash of the eye, a covert glance, a turn of the head, the ghost of a smile, the lifting of an eyebrow, and a thousand other significant signs, which human experience may interpret, but which a witness may be unable to describe, may make manifest the existence of a particular human emotion beyond the possibility of a doubt. *Travelers Ins. Co.* v. *Sheppard,* 85 *Ga.* 751 (8) (12 S. E. 18) ; *Roberts* v. *State,* 123 *Ga.* 146-160 (51 S. E. 374).

6.   The 9th ground of the motion for a new trial complains that the court erred in refusing to allow the defendant's counsel to prove by the witness for the prosecution, Mrs. Gilbert, the state of her feelings towards Ettie Densmore, the woman with whom the defendant was charged with having committed the adultery. We think such testimony was admissible, to explain or illustrate the motive actuating the witness. If the fact could be drawn out from a witness that he had enmity or malice towards some person, not even a party to or concerned in the case on trial, which the witness expected to gratify indirectly by bringing about the conviction of one on trial, or even by testifying against such a person where a con-

viction would not follow, it would seriously impair the value of his testimony. Suppose, for example, one harboring malignant hatred against a person of high repute and corresponding personal pride should by his evidence fix upon a son of his enemy a crime involving moral turpitude, would it not be eminently proper to show that the witness did in fact entertain such malignant hatred towards the father as would supply a probable motive for his evidence? "It has been frequently held that a party may prove anything which might in the slightest degree affect the credit of an opposing witness." *Bates* v. *State*, 4 *Ga. App.* 486, 491 (61 S. E. 888, 890); 8 Enc. Pl. & Pr. 120. And see Penal Code, § 1023.

*Judgment reversed. Roan, J., absent.*