1. In order to reduce a homicide from murder to manslaughter, there must be more than provocation by mere words, for "Provocation by words, threats, menaces, or contemptuous gestures shall in no case be sufficient to free the person killing from the guilt and crime of murder." Code, § 26-1007. Accordingly, in this case, even though there may have been some evidence that the defendant shot and killed the deceased because the latter said to him, "You s- of b-, why don't you quit drinking?" the judge did not err in failing to charge the jury on voluntary manslaughter. See, in this connection, Robinson v. State, 118 Ga. 198 (5) (44 S.E. 985); Allen v. State, 187 Ga. 178 (4) (200 S.E. 109, 120 A.L.R. 495); Coleman v. State, 149 Ga. 186 (2) (99 S.E. 627); Edmonds v. State, 201 Ga. 108 (5) (39 S.E.2d 24).
2. Where on the trial of a murder case the solicitor-general contended that one of the motives for the alleged crime was robbery, and tendered in evidence a deposit account of the deceased for the purpose of showing that he had cashed certain checks shortly before the homicide, and where the judge excluded such deposit account on objection of the defendant's attorney, a statement made by the judge in connection with such ruling, that "the returned check itself would be the highest and best evidence," was not cause for a new trial, as insisted, on the ground that it left the inference in the minds of the jury that there was a check cashed by the deceased, that he had a sum of money on his person, and that the defendant did rob him. Fowler v. State, 187 Ga. 406 (6) (1 S.E.2d 18); Johnson v. State, 188 Ga. 771 (6) (4 S.E.2d 639); Parker v. Wellons, 43 Ga. App. 721 (3) (160 S.E. 109). See also, in this connection, Central of Georgia Railway Co. v. Harper, 124 Ga. 836 (4), 842 (53 S.E. 391). *Page 248 
3. The State having offered in evidence "the seat of the automobile," counsel for the defendant objected to the introduction of this evidence "as far as the stain is concerned," stating further "There has been no evidence to show it is blood." The judge stated, "If I remember correctly, he [a witness] said he looked at it and in his opinion it was blood. That is admitted." The attorney for the defendant then stated, "Please note my exceptions, may it please the court." In the motion for a new trial, it was insisted that the judge's statement, "that is admitted," inferred to the jury that said stain was blood. Held, that the statement, considered with its context, was plainly a ruling that the automobile seat was admitted in evidence, and could not have been reasonably understood by the jury as meaning that the defendant admitted that the stain was blood. This ground of the motion for a new trial does not show error. See, in this connection, the authorities cited in the preceding note, and also Parker v. State, 197 Ga. 340 (5) (29 S.E.2d 61); Daniel v. Etheredge, 198 Ga. 191 (15) (31 S.E.2d 181).
4. Where a witness for the defendant was asked by the solicitor-general on cross-examination whether he was being paid anything "to come here today," and the witness answered, "Yes, sir," it was not error to allow the solicitor-general to ask the witness the further question, "How much?" over the objection that such latter question was irrelevant; the witness further testifying that he was to be paid a stated sum, he presumed by money raised by the defendant. Barrett
v. Southern Ry. Co., 41 Ga. App. 70 (10) (151 S.E. 690); Glover v. State, 15 Ga. App. 44 (6) (82 S.E. 602).
5. Under the evidence, the jury were authorized to find against the defense of insanity. The evidence authorized the verdict, and there being no merit in any of the special grounds of the motion for a new trial, the denial of a new trial was not error.
Judgment affirmed. All the Justicesconcur.
 No. 15502. SEPTEMBER 6, 1946.
Walter Hillman Yearwood was indicted for murder in the alleged killing of Harry W. Williamson on November 19, 1945, by shooting him with a pistol. The jury returned a verdict finding the defendant guilty, and he was sentenced to be electrocuted. His motion for a new trial was overruled, and he excepted.
Insanity at the time of the homicide was the sole defense urged, although in one of the grounds of the motion for a new trial it was contended that the judge erred in failing to charge the jury on voluntary manslaughter. The defendant made no statement to the jury, but introduced several witnesses who testified regarding his mental condition.
The evidence for the State, direct and circumstantial, and including *Page 249 
testimony as to incriminatory statements or confessions made by the accused, showed substantially the following:
The defendant is a veteran of the recent war, having enlisted in the United States Naval Reserve in August, 1942, and having served thereafter with the Navy in the Pacific and elsewhere. In November, 1945, he was living with his parents in Oconee County, not far from Athens, Georgia. A few days before the homicide he planned to visit relatives in Louisiana. Late in the afternoon of November 19, he started on this trip, taking position at a street corner in Athens for the purpose of hitchhiking a ride. He had on his person at this time a pistol which he had obtained at his father's house before coming to Athens. He soon caught a ride with Mr. Williamson, now the deceased. After riding with the deceased only three or four miles on the road toward Atlanta, the defendant shot and killed him with the pistol, then drove the automobile to a bridge on a country road, and there disposed of the victim's body by throwing it in a creek. After this he went on to Louisiana in the automobile and visited relatives there for several days. In December he returned in the automobile to Georgia, and on December 10 was apprehended and arrested by officers, who recognized the automobile by its license tag number. The defendant was at that time wearing a suit of clothes that had belonged to the deceased and that was in the automobile at the time of the killing. Several confessions or incriminatory statements were thereafter made by the defendant.
The defendant introduced both expert and nonexpert testimony for the purpose of showing insanity at the time of the commission of the homicide.
A sister of the defendant testified to circumstances indicating unexpected bursts of temper occurring after his return from the war, stating further: "Since he has been out of the service it has been hard for him to readjust himself. That is not a normal thing. All service men coming out of the Army for a period of time do not find it hard to adjust themselves to a different mode of living; I don't think that is true."
A brother-in-law who resided in Louisiana, and in whose home the defendant visited in May, 1945, and again in November, 1945, while in possession of the automobile, testified: "While he was at my house on this trip [in May] sometimes he acted normal and *Page 250 
then again he wouldn't; he would have spells sometimes when he wouldn't be normal. What I mean by spells and what he would do, it was more or less like fits of temper; in other words, he could not control himself and would just go all to pieces; you could correct him for anything, and he would get so nervous he would shake, and I would sit him in a chair and he would have spells and practically shake himself to pieces and couldn't control himself." The witness further testified: "I said that Hillman would go into a rage on the slightest provocation. While I don't know exactly whether he seemed to have any deep emotional feelings at that time, he would go into these rages just like something wild, and he would have a peculiar expression in his eyes, and you could tell he wasn't at himself. . . I would not know whether he knew the difference between right and wrong; I would not know that he knew it was wrong to kill a man when he was staying at my house; I am not an expert. I said I do not know whether he knew it was wrong to kill a man, and I let him stay in my house. I was never worried about that at all. I was not worrying about him killing anybody there."
Other nonexpert witnesses testified to the effect that the defendant's demeanor and disposition were not the same as they were before he enlisted in the Navy.
Thomas F. Staton, a psychiatrist, testified that he had examined the accused, spent about ten or a dozen hours in personal consultation with him, and probably forty hours interviewing people who might know something of his history, and in correlating the information thus gained; also that he had made a number of tests of the defendant. The witness further testified in part as follows: "I do not find him feeble-minded. His thinking was not such as is on a level with an ordinary person. I would not classify him as feeble-minded in the ordinary sense. . . I would say that he was like perhaps a motorist who drives over a stop sign, knowing he is doing wrong, but actually does not comprehend in his mind his wrong-doing may result in running over some one or killing somebody; he can not get his mind sufficiently organized to be systematic in his actions. . . I am not familiar with the legal definition of insanity except what I have seen in the newspapers. In my opinion, Walter Hillman Yearwood knew the difference between right and wrong in relation to the act he committed. I may qualify *Page 251 
that, he knows it naturally but I do not believe he is able to grasp the full significance of it. If you ask him any reasonable question of right or wrong, he is likely to know, but he is unable to get the best comprehension of it because he just lacks in whole emotional life. . . He is capable of planning his actions to a limited extent. I would say that he was able on the afternoon of November 19, 1945, to plan the murder of a man that night; I would say that he was mentally capable of doing that. . . I am convinced that this defendant was not suffering from any delusion. Taking my definition, as to how many people who would commit a major crime would not be suffering from a psychopathic personality, I think that would be possible, I think a person who is essentially normal, who is not psychopathic and not psychotic, may commit a major crime including murder. . . If a person has a psychopathic personality, that does not mean that he does not care, because he is constitutionally incapable of caring because he does not realize the significance of the thing and its consequences as you would find in an ordinary person; he does not have the emotional capacity for caring."
James Edward Green, professor of psychology in the University of Georgia, testified in part: "I am not an expert on law and am therefore not familiar with what constitutes insanity in the eyes of the law. When I examined this defendant, I did not apply any of the legal rules as to the definition of insanity. I would say that he knew the difference between right and wrong; I would like to explain that. I would say on an extremely superficial level mentally level he did, but so far as his emotional consciousness is concerned he has not emotional feeling as to the difference between right and wrong. He would know it was wrong to kill a man on an intellectual level; the only difference there would be the fact he could not properly evaluate the consequences of his act, because that emotion defect would cause that, I think. It is true he knows it was wrong to kill a man. He is not suffering from any delusion. . . I do not believe that I was asked the question whether there had been quite a change in him after he went in the armed forces; I would say there was a definite change. As to whether I testify there were a great many things to indicate that before he went in the service he was a psychopathic personality, I mean to give the impression to the lay observer and even to his own family and his *Page 252 
neighbors he was perfectly normal, but, if he had been examined by a competent psychiatrist or psychologist, they would have detected an unbalanced mental condition."
The State introduced several witnesses who testified that they had known the defendant both before and after he entered the Naval service, that he apparently knew the difference between right and wrong, and that he had always conducted himself as a normal person.
Guy O. Whelchel testified in part as follows: "I am a practicing physician here in Athens and have been practicing here twenty one years. I am the county physician. I have recently had occasion to examine Walter Hillman Yearwood. I am not an expert on mental diseases. I saw him twice. I made a superficial examination of him. I talked to him. I observed him. From my observation of him and talking with him I would say that he was sane. I would say he knew the difference between right and wrong. . . He said the reason he committed the act was that he was under the influence of whisky; that is what he told me. I would say that he was normal and to the best of my knowledge and opinion he was a normal young man; he so appeared to me."
Other witnesses, both expert and nonexpert, were introduced, but the foregoing is deemed a sufficient statement of the evidence for the purpose of review.
In special ground 1, the movant complained because the court refused to charge the jury on manslaughter after a written request to charge the Code, § 26-1006; and in this ground it was alleged that William H. Crawford testified that the defendant stated to the witness that after he had been in the car with Mr. Williamson for three or four miles out of Athens, Mr. Williamson said to him, "You s- of b-, why don't you quit drinking?"
In special ground 2, it appeared from a colloquy that the solicitor-general insisted there were two motives for the killing: The first being to obtain the automobile for the trip to Louisiana, and the second to take whatever money the deceased had on his person. It appears in this ground that the solicitor-general tendered in evidence a deposit account, which the deceased had with a bank in Atlanta, for the purpose of showing that the deceased had cashed two checks which had been drawn on this account on November 18 for the total sum of $60. Counsel for the defendant objected to *Page 253 
this evidence on the ground that it did not illustrate any issue in the case, there being "no testimony introduced by inference or otherwise that this defendant took any money off this man." The court ruled as follows: "I think there is higher and better evidence as to how much money he drew besides this record. I will have to sustain the objection. The returned check itself would be the highest and best evidence."
In this special ground, the movant contended that the statement of the judge, "the returned check itself would be the highest and best evidence," left the inference in the minds of the jury that there was a check cashed by Mr. Williamson, that Mr. Williamson had a sum of money on him, and that this defendant robbed Mr. Williamson, thereby proving the theory that there was robbery, when in fact no testimony was introduced during the trial of this case proving robbery.
Special ground 3 of the amendment is as follows:
"Mr. Pollock: `I want to introduce in evidence the pistol with the bullets.'
"(The pistol and bullets identified by witness offered and received in evidence as State's exhibits.)
"Mr. Pollock: `I also offer in evidence the clothes and the shoes the defendant was wearing at the time of his arrest and also the seat of the automobile and seat covers.'
"Mr. Hawkins: `I am objecting to the seat of the automobile as far as the stain is concerned. There has been no evidence to show it is blood. The witness testified to the fact it was blood but changed his testimony and said in his opinion it was blood.'
"The court: `Under our law, Mr. Hawkins, he can give his opinion provided he gives his reasons upon which that opinion is based. If I remember correctly, he said he looked at it and in his opinion it was blood. That is admitted.'
"Mr. Hawkins: `Please note my exceptions, may it please the court.' Movant contends that the statement of the court, `that is admitted,' inferred to the jury that the said stain was blood."
In special ground 4, it appeared that the solicitor-general asked Herbey Cleckley, an expert witness for the defendant, whether he was being paid "to come here today," to which he answered, "Yes, sir." The solicitor-general further asked, "How much?"
Counsel for the defendant objected to the question, "How much?" on the ground that it was irrelevant. *Page 254 
"The Court: `Would it show interest or want of interest?'
"Mr. Hawkins: `He asked him if he was paid to come here, and the next question was "How much?" and that is the question I am objecting to.'
"The Court: `I am overruling your objection.'
"The Witness: `I understand I am to be paid $150, I presume by money raised by the defendant."'
It was prayed that a new trial be granted on each and every ground of the motion for a new trial.