## VUN CANNON *v.* THE STATE.

No. 17655.  Submitted November 13, 1951—Decided January 15, 1952.

*Harold J. Moody* and *Mack G. Hicks,* for plaintiff in error.

*Eugene Cook, Attorney-General, W. Glenn Thomas, Solicitor-General* and *R. L. Addleton, Assistant Attorney-General,* contra.

CANDLER, Justice.  Leo W. Vun Cannon was indicted by a grand jury in the Superior Court of Appling County for the murder of Eugene Bechion.  He was convicted of murder, with a recommendation for life imprisonment.  His motion for a new trial consisted of the usual general grounds and several special grounds.  The motion was overruled, and he excepted.

Insofar as it need be related here, the State's evidence in substance shows: The defendant, his brother, John Vun Cannon, and the deceased went to the home of Mrs. Laura Martin on the morning of December 24, 1950, reaching there before any member of the family had gotten up.  They were all drinking and continued to do so.  The deceased, a much younger man than the defendant, had been staying with the latter for several years, and drove his car for him.  After a late breakfast, the defendant and Mrs. Laura Martin agreed to take the latter's son-in-law, William Mancil, who was at home on furlough from the Army, to see his mother.  When ready to leave, the defendant asked Lillian Courson, a sixteen-year-old daughter of Mrs. Martin, to tell the deceased to come on as he was ready to go.  The deceased told Lillian Courson to tell the defendant that he was not going, but would remain at the Martin home.  That message was conveyed to the defendant, who immediately afterwards went into the Martin house and into the room where the deceased was.  As the defendant entered the house he said, "I'll get him if it takes this," meaning his pistol which he then had in his hand.  Immediately after the defendant entered the room where the deceased was, Lillian Courson, who was standing on the veranda, heard the defendant say, "Yes, you will," and the deceased say, "No, I won't," and just following that she heard the report of a pistol. Lillian Courson, as the first person to do so, went into the room where the shooting occurred immediately afterwards, and the deceased had no weapon of any kind, but had been shot.  Soon after the shooting, and before the deceased had been removed from the Martin home, the defendant said, "All he wanted was one more shot through his G—d— head. and he would not be able to talk any more."  Over the defen-

dant's protest, the deceased was carried to a hospital where he died a few days later. Two sons of Mrs. Martin, after learning of the shooting, went to her home before the defendant was arrested, and the defendant voluntarily stated. to one of them, Carson Courson, that the deceased cursed him and he shot him, and that that was the reason for the shooting. He also stated to Monroe Courson, the other son of Mrs. Martin, that he shot the deceased to protect Lillian Courson. W. A. Bechion testified that he went to the hospital soon after his son was carried there and before he was undressed; that he and two hospital attendants searched him and got his knife and pocketbook; and that the knife taken from his son's pocket was very similar in appearance to one produced by Mrs. Martin some days after the shooting.

Mrs. Laura Martin, as a witness for the accused, testified that he had rooms rented in her house, which he used as a palmist and a spiritual healer. On the day of the shooting, and after her daughter Lillian Courson had reported to the defendant that the deceased was not going with him, the defendant stated that he would get the deceased out of the house, as he was drunk. The defendant started in the house and she followed him, fearing there might be trouble. When she got within two or three feet of the door she heard the deceased say, "I will not do it. I'll cut your guts out of you—you son-of-a-bitch." In reply to that she heard the defendant say, "Don't do that," and then she heard the report of a pistol. She then ran into the room and the defendant said, "Mrs. Martin, get the knife, I think I have shot him in the hand." She said to the deceased, "Give me the knife, son," and she took it away from him and put it in her bosom. Concering the knife produced by Mrs. Martin and about which she testified, Donnell Mancil, a daughter of Mrs. Martin, testified that her mother had bought the knife about which she testified from the deceased some several months before the shooting; that her mother kept it around the kitchen and in her pocketbook; and that her mother said nothing about taking a knife away from the deceased until several days after the shooting. Carson Courson also testified that he talked to his mother, Mrs. Martin, in the presence of the defendant on the day of the shooting and soon thereafter; that she did not say anything at that time about having taken a knife away from the deceased

immediately after the shooting; and that it was several days after the shooting before she said anything about a knife.

1. There is no merit in the general grounds of the motion for new trial. The jury was fully authorized to find from the evidence that the defendant shot the deceased because he cursed him; and mere words, however vile, will not justify the taking of human life. Code, § 26-1007; *Robinson* v. *State,* 118 *Ga.* 198 (5) (44 S. E. 985); *Smarrs* v. *State,* 131 *Ga.* 21 (6) (61 S. E. 914).

2. The solicitor-general asked the State's witness Donnell Mancil if she had ever seen any of the "fortune-telling stuff," "hoodine stuff," "different kinds of bottles," or "powders" which the defendant used in the conduct of his fortune-telling business. She answered, "Yes, sir." The question was objected to by counsel for the accused, and a motion was timely made to rule out the answer on the grounds that it was irrelevant, immaterial, harmful, and prejudicial. The solicitor-general then stated to the court that he could not put in all of his evidence at one time; that he wanted to show the whole set-up "out there" at the time of the shooting; and that the evidence objected to would, as he anticipated, go to the credibility of two or three witness. The court ruled: "I will admit it at this time under that statement and, if it is not connected, I will rule it all out and instruct the jury to disregard it." As to this, no subsequent ruling was invoked or made by the court. In these circumstances, the ruling as made was not final and affords no sufficient reason for a reversal, even if erroneous. Where testimony is provisionally or conditionally admitted, counsel must renew his objection to it later and invoke a final ruling if he still desires its exclusion, and on his failing to do so no valid assignment of error can be made upon the court's ruling. *Thompson* v. *State,* 166 *Ga.* 512 (6) (143 S. E. 896); *Mickle* v. *Moore,* 193 *Ga.* 150 (17 S. E. 2d, 728); *Connor* v. *Rainwater,* 200 *Ga.* 866 (38 S. E. 2d, 805); *Bryan* v. *Barnett,* 205 *Ga.* 94 (52 S. E. 2d, 613).

3. After he had testified that his son had worked for the defendant for several years, and that they would frequently have "a little run-in or something or something like that," and over an objection that it was not in rebuttal of any evidence offered by the defendant, and that it was irrelevant, immaterial, and too remote to have any probative value as evidence, W. A. Bechion,

father of the deceased, was permitted to testify that the accused came to his home looking for the deceased on the night of June 10, 1949, with a hunting knife in his hand; that, after his son (the deceased) had gotten up, the defendant said to him, "Come out of there—you yellow rascal"; and that, after his son had stated to him that he was not going back to work for him, he said to him, "Yes, you are or I will cut your damn head off." It is argued that this testimony was harmful and prejudicial, irrelevant, and immaterial, and threw no light on the issue being tried because of its remoteness and lack of any connection therewith. To this we do not agree. Threats, though remote, are admissible in murder trials for the purpose of showing motive and malice on the part of the accused. *Shaw* v. *State*, 60 *Ga.* 246 (2); *Everett* v. *State*, 62 *Ga.* 65 (2); *McDaniel* v. *State*, 100 *Ga.* 67 (27 S. E. 158); *Smith* v. *State*, 167 *Ga.* 271 (145 S. E. 517); *Groves* v. *State*, 175 *Ga.* 37 (164 S. E. 822). And the remoteness of a threat made by the accused against the deceased does not affect its competency as evidence, but affects only its weight or probative value. *Keener* v. *State*, 18 *Ga.* 194 (63 Am. D. 269); *Willingham* v. *State*, 169 *Ga.* 142 (149 S. E. 887).

4. Another special ground complains of the court's failure, without request, to charge generally on the law of voluntary manslaughter. It is alleged and argued that the State's evidence and the defendant's statement made a charge upon that subject of the law applicable and mandatory. We do not think so. As to the evidence, it is sufficient to say that provocation by "words, threats, menaces, or contemptuous gestures" is never in any case sufficient to reduce an unlawful homicide from murder to voluntary manslaughter. See, in this connection, *Ellison* v. *State*, 137 *Ga.* 193 (5) (73 S. E. 255); *Anderson* v. *State*, 196 *Ga.* 468 (6) (26 S. E. 2d, 755); *Yearwood* v. *State*, 201 *Ga.* 247 (1) (39 S. E. 2d, 684); Code, § 26-1007. And, as to the statement, the defendant's version of the shooting was as follows: ". . and then I asked Lillian to call Eugene—she was standing on the porch—and she came back and said he was not going, and Mrs. Martin said, 'I will go and see what is the matter,' and I said 'No, I will go.' So I walked in, and when I got in he was coming down the hall this way, and he got pretty close to the door and I said, 'Eugene, come on and let's go,' and he said, 'No, I ain't going no

damn where until I straighten out some damn lies told on me,' and I told him I hadn't heard of any lies and to come on and stop cursing, and he said, 'No, I will cut your damn head off,' and he come on me with a knife, and I said, 'Eugene, don't, stop, drop that knife,' and he said, 'No, I ain't going to do it,' and he kept coming on me, and he got close enough that I could reach out and touch him; he didn't stop and I shot him. I told him two or three times and he didn't stop. I didn't want to hurt him, but that was my only chance. I knew he was going to kill me." Even if the statement of the defendant was sufficient to authorize a charge upon the subject of voluntary manslaughter, there was no written request so to charge; and, in the absence of a written request, the court was not bound to present a theory of the case based solely upon the statement. *Felder* v. *State*, 149 *Ga.* 538 (101 S. E. 179); *Brown* v. *State*, 201 *Ga.* 751 (41 S. E. 2d, 156), and cases there cited.

(a) Under the above holdings, there is no merit in that special ground of the amended motion which complains of the court's failure to instruct the jury on the punishment prescribed for voluntary manslaughter.

5. The court charged literally Code §§ 26-1011 and 26-1012, defining justifiable homicide and concerning the fears of a reasonable man, and immediately thereafter stated to the jury that "Provocation by words, threats, menaces or contemptuous gestures shall in no case be sufficient to free the person killing from the guilt and crime of murder. The killing must be the result of that sudden, violent impulse of passion supposed to be irresistible; for if there should have been an interval between the assault or provocation given and the homicide, of which the jury in all cases shall be the judges, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge, and be punished as murder." It is alleged and argued that the quoted portion of the charge is a part of Code § 26-1007, defining voluntary manslaughter, and that the charge as given intermingled the law of justifiable homicide and the law of voluntary manslaughter, and was for that reason erroneous and, consequently, injurious to the accused. We fail to see how any injury resulted to the accused therefrom. It is true that provocation is not an element of self-defense or justifiable homi-

cide. *Deal* v. *State*, 145 *Ga.* 33 (88 S. E. 573). But by charging it in this case in connection with an instruction on justifiable homicide the jury most likely understood from the court that, if there was a sudden, violent impulse of passion supposed to be irresistible and there was not sufficient cooling time for the voice of reason and humanity to be heard, they would be authorized to find the defendant not guilty. In other words, the court, by charging on the subject of provocation which will under certain circumstances reduce an unlawfull killing from murder to voluntary manslaughter, inferentially stated to the jury that provocation, where there was not sufficient cooling time, would constitute legal justification for a homicide. The charge complained of was, therefore, beneficial to the accused and not injurious as contended; and, that being true, it affords no reason for a reversal. *Dill* v. *State*, 106 *Ga.* 683 (4) (32 S. E. 660).

The judgment complained of is not erroneous for any reason assigned.

*Judgment affirmed. All the Justices concur.*