## HACKNEY *v.* THE STATE.

1. Before a conviction can be had for selling any portion of the crop, made on rented land, without first making payment for supplies advanced by the landlord, for which a lien arose in his favor by operation of law, it must be shown that the accused was a tenant of the landlord in whose favor the lien existed; and it is not sufficient merely to show that the accused cultivated the crop, when it also appears that another person (his wife) had rented the premises and given her obligation for the payment of the rent.
2. The accused in a criminal case, while delivering his statement, is not under examination as a witness; and it is error in the presiding judge, during or at the conclusion of the statement, to propound a question to the accused, seeking to elicit an answer touching the facts brought out by the evidence in the case. It is the right of the prisoner not to be compelled to answer any question, nor submit to cross-examination; and he will not be held to waive such right by making answer to a question propounded by the presiding judge.

Submitted April 19, — Decided May 5, 1897.

Indictment for misdemeanor. Before Judge Reese. Taliaferro superior court. February term, 1897.

At the trial the husband of Mrs. Daniel (her name being signed as prosecutor to the indictment) testified: Defendant Frank Hackney rented land from my wife in 1895, the contract being made with her. Supplies necessary to make the crop were furnished him, including fertilizers worth $18.10, for which he did not pay. He remained on the place all the year, and made a crop. The fertilizer debt was due October 15, and he had not got out the crop on or about the first of

December to make payment, though repeatedly urged to do so
by me. I was acting as agent for my wife. Finally he set a day
when he would have it ready to settle, but he sold that cotton be-
fore I came. He told me he came down to Reed's, who cheated
him out of $5.00, and that he lost the balance of the money he re-
ceived for the cotton. The crop was cultivated on my wife's land.
I rented a mule to him that year to make the crop. I do not re-
member that any note or papers were given for supplies by him
and his family. He gave notes for the rent of the mule and
of the land. We rented him the land before we rented him
the mule. I think he signed the rent note and the mule note.
(The papers handed to witness were identified by him as the
notes referred to.) That is signed by his wife, and the mule note
also signed by her. It is true she and not he was the tenant.
Several times after he sold the cotton, I told him if he would
pay for the guano it would be all right. No note was given
for the guano. He cultivated the crop. That bale of cotton
was worth $20 or $25. We were looking to him to pay the
debt for the guano. My wife made arrangements with him. I
can not tell whether it was he or his wife who owed the debt.
He made all the arrangements about the provisions and ferti-
lizers; we looked to him for it.

Reed testified, that about the time of the sale of the cotton,
defendant came into his store and asked him to change a dol-
lar, handing him a ten-dollar bill. Reed said to him it was
a ten-dollar bill, and he said, "It was? I had some, but did
not know what it was." Reed noticed that he had other
money in his hand, and thereupon requested him to pay a
debt of $7.00 or $8.00 which he had been owing Reed for sev-
eral years. Defendant replied that he could not do so, as the
money was not his. Reed insisted that it was, and proposed
that if that was all the money defendant had he need not pay
Reed anything, but that if he had more he should pay Reed
$5.00 and take a receipt in full. To this defendant agreed,
ran his hand in his pocket and on withdrawing it showed that
he had $10, $5, and $2, or $3 more, and he "sorter" dropped
it, and Reed picked five dollars of it and kept it, although de-
fendant insisted that it was not his, and stated that he had a

33

guano debt to pay and then he would pay Reed something. He bought a pint or two of liquor from Reed that day.

. J. F. Holden testified, that he bought cotton of defendant in 1895, but did not think he bought any as late as December. It was purchased in the name of Holden & Company, of which firm W. O. Holden was a member. Josh Evans testified, that he brought the cotton in question to the gin for defendant, and after it was ginned, sold it to Oscar Holden and gave the money to defendant, there being about $18 or $20. The cotton was brought from Mrs. Bird's on the Aleck Daniel plantation where defendant was working that year.

According to defendant's statement, he sent the cotton by Josh Evans to the gin in town, and while waiting for it to be ginned (this being delayed until the day was far spent) fell to drinking and was nearly drunk. He then told Josh to sell the cotton to Holden and bring back the money, which was done. Defendant then went to Reed and asked him to change some of the money. Reed did so, and asked for payment of an old debt; and defendant replied that he could not pay it, that this was not his money, and that he got it to pay his guano bill, adding that he would pay Reed when he got the money. Reed said, "Come around here and let me see how much you got." Defendant ran his hand in his pocket, and Reed pulled therefrom a five-dollar bill sticking between defendant's fingers, calling defendant an opprobrious name, and saying he would never get this any more. Defendant then went home, but lost the rest of the money, being drunk. In answer to a question put by the court, he stated that he got Josh to sell the cotton because he, defendant, was drunk.

After conviction, defendant's motion for a new trial was overruled, and he excepted. The grounds of the motion are stated in the opinion.

*Samuel H. Sibley*, for plaintiff in error.

*Robert H. Lewis, solicitor-general*, contra.

LITTLE, J. Hackney was indicted, in the superior court of Taliaferro county, for the offense of misdemeanor, in that, being the lawful tenant of Rebecca M. Daniel, he secured from her guano to the amount of $18.10, to be applied to the crops to

be raised by him on the rented land during the year of his tenancy, and that he did sell and dispose of one bale of cotton raised on the land of Mrs. Daniel by him as her tenant during that year, without the consent of Mrs. Daniel and without paying for said guano, to her injury, and with intent to defraud Mrs. Daniel, whereby she sustained a loss.  As will appear from the report of the case, the defendant was convicted, and made a motion for a new trial.  Before considering the grounds of the motion, it may be well to ascertain the law in force in relation to what sales of farm products made on the land of another are in violation of the criminal laws of this State.

. Section 671 of the Penal Code, which is a revision of section 4600 of the Code of 1882, makes it a misdemeanor for any person, after having made a mortgage on personal property, to sell or otherwise dispose of that property before the payment of the mortgage debt, etc.  By the acts of 1875 (Acts 1875, p. 26) and 1876 (Acts 1876, p. 114) the provisions embodied in this section of the Penal Code were "extended to include liens for rent and advances made upon crops by landlords, employers or others, as authorized by law"; and by those acts it was made a misdemeanor for any person to sell any part of the crops on which a lien for rent and advances existed in favor of landlords, employers or others, *as authorized by law.*  It is further material to consider what were the provisions of law which created these liens in favor of landlords, employers and others, at the date of these acts, violations of which by sale of the encumbered property were made misdemeanors.  By the act of 1873 (Acts 1873, p. 42) the law of liens in this State was regulated, and certain liens were declared to exist in favor of landlords and others; this law of liens was codified in sections 1977 and 1978 of the Code of 1882.  By the act of 1873, liens were created in favor of factors, merchants, landlords, dealers in fertilizers, and all other persons furnishing supplies, money, farming-utensils, or other articles of necessity to make crops; and also all persons furnishing clothing and medicines, supplies or provisions for the support of families, or medical services, tuition or schoolbooks, were given the right to secure themselves from the

crops of the year in which such things were done or furnished, on certain conditions; but by an act approved February 20, 1874 (Acts 1874, p. 18), so much of this law as gave liens to factors, merchants, and other persons, *except landlords*, was repealed, and so much of the original act as is codified in section 1978 of the Code of 1882, which relates to landlords, was declared to be in full force and in no way altered. So at the date of the passage of the acts of 1875 and 1876, supra, which extended the provisions of the act in relation to the wrongful sale of mortgaged property to include wrongful sales of property under liens for rent and advances made on crops, the law so stood as that these acts applied exclusively to sales of property subject to the liens of landlords, which liens existed only on conditions expressed in the statute. These are: 1st. A special lien for rent. Code 1882, § 1977. 2d. Liens for supplies, money, farming-utensils, and other articles necessary to make crops. Code 1882, § 1978, paragraphs 1, 2, 3, 4, 5, and 6. Our immediate enquiry is directed to the consideration of the liens of the latter class. It is provided in paragraph 1 of this last section, that this lien shall arise by operation of law *from the relation of landlord and tenant*, as well as by special contract in writing, whenever the *landlord* shall furnish for the purposes named any of the articles enumerated. In the case under consideration it is not claimed that there was any special contract in writing. So we have only to consider the question of such liens as arise by operation of law.

It may be well here to note that there is another provision of law, found in section 680 of the Penal Code, which makes a sale of any part of the crop a misdemeanor where such sale is made without the consent of the landlord and before he has received his part of the crop and payment for all advances made in the year the crop was raised. This section is codified from the act of 1889 (Acts of 1889, p. 113), and applies exclusively to *croppers*. A cropper and a tenant do not, in law, belong to the same class, and do not possess the same rights in relation to the crops raised, and are not the subject of the same remedies. The rights of the cropper are subject to the paramount title of the landlord to all the crops raised,

which, by the act last referred to, is vested in the landlord until he has been fully paid rent and advances; while under the contract of tenancy the landlord has a lien by operation of law on the property of the tenant, special in its nature, for rent and advances, attaching on all the crops raised on the rented land during the year of the tenancy. "There is an obvious distinction between a cropper and a tenant. One has a possession of the premises exclusive of the landlord; the other has not. The one has a right for a fixed time; the other has only a right to go on the land to plant, work and gather the crop. The possession of the land is with the owner as against the cropper. This is not so of the tenant." *Appling* v. *Odom*, 46 *Ga.* 583; *Sims* v. *Dorsey*, 61 *Ga.* 488; *Almand* v. *Scott*, 80 *Ga.* 95. So that the two classes of cases wherein it is a misdemeanor to make sale of crops grown on the land of another, may be stated to be: First, it is a violation of law for a tenant to sell or otherwise dispose of any part of the crop raised by him on the rented land on which his landlord has either a special lien for rent, or a lien for supplies, money, farming-utensils, or other articles of necessity to make crops, without first discharging such liens, or obtaining the consent of the landlord to such sale or other disposition of the crops. Second, it is a violation of law for any cropper to sell or otherwise dispose of any part of the crop grown by him, without the consent of the landlord and before the landlord has received his part of the entire crop and payment for all advances made to the cropper in the year the crop was raised. From this it will be seen that the allegations necessary to be made in the one case will not support a charge in the other, and the proof necessary to convict is different in the two cases.

In the case under consideration, the defendant was indicted because as the *tenant* of Mrs. Daniel he secured from her guano of a certain value to be applied in raising the crops on the rented premises during the year of the tenancy, and did sell and dispose of a bale of cotton so raised, without her consent and to her injury. There are several grounds set out in the motion for new trial, the refusal to grant which is the error assigned. It is alleged that the verdict is contrary to law.

The bill of indictment avers that the defendant rented the land from Mrs. Daniel for the year 1895; but the evidence shows that his wife, Mat Hackney, rented the land, for which she gave her rent note, and that Mat Hackney, and not the defendant, was the tenant. It is true that the evidence on the part of the State showed that, while the relation of landlord and tenant existed between Mrs. Daniel and Mat Hackney, the wife of the defendant, the defendant in fact cultivated the crop. This fact alone, however, did not make him liable as a tenant, nor give to the landlord any right of proceeding against him as such. But it is enough to say that the evidence clearly showed that the defendant was not the tenant of Mrs. Daniel. The lien provided for in section 1978 of the Code of 1882 arises, by operation of law, from the relation of landlord and tenant; and unless this relation exists, no lien arises. It being undisputed by the evidence in this case that the defendant was not the tenant of Mrs. Daniel, it must follow that a conviction on an indictment charging and setting up that he was the tenant who produced the cotton which he sold, and on which Mrs. Daniel as his landlord had a lien, is contrary to law.

Another of the grounds of the motion for new trial is, because the court charged: "It is wholly immaterial who the rent contract in this case was made with, and whether Mr. Daniel or Mrs. Daniel was the landlord, or who was or who wasn't the landowner. I charge you, if the defendant procured credit for supplies and guano or fertilizers and got the credit through Mrs. Daniel or Mr. Daniel, it is wholly immaterial which, and the produce upon the land upon which the guano or fertilizer was used was misappropriated or was applied otherwise than in discharge of the debt incident to the purchase of the guano, I charge you he was guilty," etc. By this charge the jury was instructed that a conviction for the offense with which the defendant was charged would be sustained even if the fertilizer was procured on the credit of the defendant through either the landowner or another person. Such is not the law as we understand it. This court ruled in the case of *Scott* v. *Pound,* 61 *Ga.* 579, and reaffirmed the same

in *Swann, Stewart & Co.* v. *Morris & Cook*, 83 *Ga.* 143, as follows: "In order for a landlord to have a lien upon his tenant's crop for supplies under 'section 1978 of the Code [of 1882], the landlord must furnish the articles as landlord"; and in *Brimberry* v. *Mansfield*, 86 *Ga.* 792, that "a landlord has no lien for supplies which his tenant purchased from a merchant and for which he stood the tenant's security." These rulings are right, under the statute. The charge of the trial judge was in accord with the act of 1873, supra, regulating the law, of liens, but which by subsequent amendment were restricted to landlords eo nomine; and as the law stood at the time of the trial, the charge was error.

2. Another ground in the motion for new trial is, because, while defendant was making his statement, the court asked defendant's counsel: "May I ask the defendant a question?" Counsel replied: "I doubt the propriety; the court may act on its own discretion." The court then asked defendant: "Why was it you sent that cotton by a third person, and didn't bring it and sell it yourself?"

Prior to the act of 1874 the right of the accused in criminal cases to make a statement was restricted. By that act, which is codified in section 1010 of the Penal Code, the right was given to an accused in all criminal cases to make *such* statement in the case as he or she may deem proper *in his or her defense*. The accused is not under oath; the statement is not the foundation for impeachment by showing general bad character. *Doyle* v. *The State*, 77 *Ga.* 513; *Vaughn* v. *The State*, 88 *Ga.* 735. The defendant incurs no penalty for not speaking the truth. *Poppell* v. *The State*, 71 *Ga.* 277. The statement can not be restricted to such facts as would be admissible in evidence. *Coxwell* v. *The State*, 66 *Ga.* 310.

It is clear that the effect of this legislation so interpreted was to give the prisoner the right in his own way to make such statement in his defense as he may deem proper, and, exercising this right, he is entitled to do so in the freest manner. No one but he is to judge what he shall say or not say in relation to the facts. The object is accomplished when he has had an opportunity of stating such or all of the facts as he wishes

to submit; and having done so, the statute consistently gives the jury the authority to believe none, a part, or all of such statement. Evidence given by a witness has inherent strength, which even a jury can not under all circumstances disregard. A statement has none. It is allowed by the law as one means of protection to the accused. When made it must always be under the pressure of temptation to place his acts in the light most favorable to himself; and hence the value of the statement in ascertaining the truth of the accusation can only be ascertained, in shaping the verdict, by those charged with the ascertainment of the facts—the jury. But he is entitled to make such a statement in his defense as he sees proper, and he shall not be compelled to answer any question on cross-examination should he think proper to decline to answer. In the case of *Cicero* v. *The State*, 54 *Ga*. 156, it was ruled by this court, when the defendant on a preliminary hearing for a felony made a statement, that a magistrate had no right to examine the defendant for the purpose of obtaining from him contradictory statements; and in *Brown* v. *The State*, 58 *Ga*. 212, it was ruled that in making his statement the prisoner is not under examination, and his counsel has no right to ask him questions. We do not intend to rule that a defendant who makes a statement can not be cross-examined. The statute clearly provides that he may; but it is a matter of right to him not to be so examined unless he desires, and this willingness to submit to the examination must be expressed by him, and after he has completed his statement; and without his consent given thereto, neither the court nor counsel can legally propound any question to him.

*Judgment reversed. All the Justices concurring.*