*E. P. & J. Cecil Davis*, contra.

## VINCENT *v.* THE STATE.

1. The manner and appearance of the defendant whose acts and utterances constitute part of the res gestæ are relevant testimony on his trial for homicide; and that he spoke pleasantly and was in good humor, when he met the deceased, are matters of fact, not of opinion requiring the statement of the facts upon which such opinion is based.

2. Before proof of uncommunicated threats is admissible in defense, there must be evidence tending to show that the deceased was the assailant in the fatal encounter, or did some overt act showing an intention to carry such threats into execution.

(a) The proper foundation for the admission of uncommunicated threats can not be laid by the defendant's statement alone.

(*b*) When the evidence leaves it doubtful as to which of the parties began the mortal combat, and there is testimony tending to show that the slayer killed his adversary in self-defense, or under the influence of reasonable fears and not in a spirit of revenge, evidence of this character is admissible to show the state of mind or feeling on the part of the deceased, and thus illustrate his conduct and throw light upon his intention and purpose.

(*c*) A witness can testify as to threats which he heard, although he did not know who made them, and did not communicate them to the defendant, to corroborate other witnesses who swore that these threats, were made by the deceased toward the defendant, and that they had communi- cated them to the defendant a few days prior to the homicide.

3. Testimony that vomit was found the next afternoon on the two beds in, and on the floor of, the room of the hotel occupied by the defendant and two other guests on the Wednesday night preceding the homicide on the next Saturday, the defendant having left early the next morning apparently sober, and the other two guests not checking out until the following afternoon, was irrelevant and should have been rejected on timely objection of the defendant; and the admission of such irrelevant evidence is ground for the grant of a new trial under the facts of this case.

4. The judge may interrupt the defendant when, in making his statement, he is stating wholly irrelevant facts, and instruct him to leave out such facts, and confine his statement to the case.

5. An instruction that the defendant had no right to arm himself and go to the place of business of the deceased, if he ought to have expected, as a reasonable man, that his presence there would provoke a difficulty, was inaccurate and erroneous, as the right of the defendant to seek an interview with the deceased depended, not on the soundness of his judgment in determining the consequences thereof, but upon the peaceful intent with which he sought such interview.

6. An instruction, that "Legal malice is the intent unlawfully to take away the life of a human being," is inaccurate and erroneous, as it excludes deliberation or premeditation, which is the gist of murder.

7. An instruction, that if the jury found that the deceased had threatened the life of the defendant, and had a pistol for the purpose of killing him, such threat and conduct "would not justify the defendant in going to the deceased's place of business with the intent to kill him, and, in pursuance of such threats, taking his life," assumes that the defendant went to the place of business of the deceased with the intention to kill him, and, in pursuance of such intent, took his life, and amounts to an expression or intimation of opinion by the court that these facts were true. Such instruction requires the grant of a new trial. (GILBERT, J., dissents.)

8. The trial judge did not err in failing to give in charge to the jury section 76 of the Penal Code, when he fully instructed the jury as to the law of justifiable homicide and its effect upon their verdict.

9. The court did not err in failing to give in charge to the jury the law of voluntary manslaughter under the evidence in this case.

10. When the defense is set up that the defendant killed the deceased under

the influence of reasonable fears, and not in a spirit of revenge, the jury must find, in order to acquit, that the circumstances surrounding the defendant at the time of the killing were sufficient to excite the fears of a reasonable man, and, in reaching a conclusion on this question, must do so from the standpoint of a reasonably courageous man, situated as the defendant was, when the fatal shot was fired or the mortal blow was inflicted.

11. We find no material errors in the other grounds of the motion for new trial, and therefore do not refer to them specifically. As a new trial is granted, we will not discuss the evidence.

No. 2592. APRIL 14, 1922.

Indictment for murder. Before Judge Tarver. Murray superior court. October 29, 1921.

Verner Vincent was indicted for the murder of Smith Treadwell. He was convicted, and brought his case to this court, assigning error on the judgment of the lower court overruling his motion for new trial.

On May 26, 1920, Miss Ora Bell Jones, Miss Thelma Treadwell, and Drs. Swinney and Munford were traveling in an automobile, which broke down at Crandall. The defendant, a traveling salesman, was spending the night at Crandall and had retired for the night. Dr. Swinney went to his room and asked him if he would not lend them his car in order that they might return to Chatsworth, where they lived. The defendant replied that the car did not belong to him, and for that reason he was unwilling to lend it to them. When informed of the plight in which these young ladies would be left if they could not get home that night, the defendant stated that, although he was tired out and had retired for the night, he would take the automobile in which he was traveling and take them back to Chatsworth. This he did. Miss Jones sat on the front seat of the automobile with the defendant. Miss Treadwell and the doctors sat on the back seat. The highway on which they were traveling passed under a culvert. Under this culvert the defendant stopped his car and remarked that he was going to take a drink. He reached back in his pocket to take out a bottle for this purpose. Miss Treadwell objected to his taking a drink. The defendant said that he was not going to hurt any one. Miss Treadwell replied, that, if he was going to drink, he would turn the car over. The defendant laughingly said he would turn the car over and kill every damn one in the car. Miss Treadwell then jumped out of the car and ran forward, and Dr. Swinney followed

her. After she got out the defendant asked Miss Jones what that meant, and Miss Jones told him that Miss Treadwell objected to his taking a drink, but that she would get back in the car when they overtook her. The defendant overtook Dr. Swinney and Miss Treadwell going up a hill, and the defendant slowed down his car and asked them to get back in, saying he was going to bring Dr. Munford and Miss Jones on to Chatsworth. Dr. Munford said to Miss Treadwell and Dr. Swinney to get in; that there was no use of acting a fool like that. Dr. Swinney replied that they would walk on; that he would get a car at Eton and come on to Chatsworth.

The defendant spent the night at the hotel in Chatsworth. Miss Ora Bell Jones was the daughter of the keeper of this hotel. When the defendant reached the hotel with Miss Jones and Dr. Munford, all the rooms had been taken by guests. For this reason he did not register, but spent the night in a room occupied by two other guests, there being two double beds in this room. After the defendant had retired the deceased came to the hotel, hunting for him. The deceased was very angry, declaring that the defendant had insulted his sister. He endeavored to locate the room in which the defendant was sleeping. He cursed and abused the defendant as a " God damned son of a bitch." He went through the hotel endeavoring to find the defendant. He threatened to kill the latter if he could find him. The deceased was armed with a pistol. He declared that if he did not get the defendant that night he would get him the next morning. It seems that the defendant did not know that the deceased had gone to the hotel that night hunting for him, and did not know that the deceased had abused him and threatened to kill him. On the following morning he was informed by the proprietor of the hotel of the conduct of the deceased the night before, and of his threats to kill the defendant. The defendant was advised by Miss Jones to call up Miss Treadwell and apologize to her for his conduct on the way from Crandall to Chatsworth the night before. Miss Jones told him that the deceased was mad because he had been informed that the defendant had offered to give his sister a drink of liquor on the trip; and Miss Jones informed him that, if he would call up Miss Treadwell and apologize to her, the matter could be smoothed over. Thereupon he telephoned Miss Treadwell. She and the

defendant differed as to what passed between them. She testified that the defendant told her he understood that she had become offended at what had happened the night before. She said she certainly did, that he must have thought they were all heathens up there; and at that they were disconnected, or Vincent hung up. She helloed once or twice, and never heard anything more from him. The defendant stated, and Miss Jones testified, that the latter called Miss Treadwell over the telephone, that the defendant made himself known to Miss Treadwell, and said he was willing to apologize for what had happened the night before. Miss Jones could not understand the reply of Miss Treadwell; but the defendant in his statement said that she referred him to her brother, the deceased, to settle the affair. The defendant then went to see the sheriff of the county, but he was out. He saw his deputy, told him what had occurred, and asked him to see the deceased for the purpose of getting this matter amply adjusted. The defendant then left town, and did not return until the following Saturday. This officer then saw the deceased, told him that the defendant was willing to apologize to the sister for what occurred on Wednesday night, and the deceased then stated that this would be all right. The defendant did not afterward see this officer to ascertain the result of his interview with the deceased, looking to a settlement of this difficulty.

On the following Saturday morning, according to the evidence of the State, the defendant went to the garage of the deceased, who was sitting in an automobile, patching an inner tube. W. T. Brooks, a witness for the State, was standing to one side of the car, talking to the deceased. The defendant came in and said, " Good morning, gentlemen," walked around, and asked if the deceased was in. He then walked on around to the front of the car. When he got about even with the front wheel, on the right-hand side, he asked if that was Mr. Treadwell, in the car. He then walked on about even with the windshield, and asked the deceased if he was Mr. Treadwell. The deceased made no reply. The defendant said, " Are you the man that was looking for me to shoot me the other night?" and then began drawing his pistol and shot him four times. This is substantially the evidence of three of the eye-witnesses to this tragedy.

The defendant stated that after being informed, on Thursday

morning, of the conduct and threats of the deceased against him on the previous night, he bought a pistol for the purpose of protecting himself. Before leaving Crandall on Saturday morning for Chatsworth, he felt so certain that this affair had been settled and was all over that he tried to sell his pistol to several persons. When he drove into Chatsworth Saturday morning he happened to remember that Bob Bradley had told him that this pistol was Bill's individual gun. So he decided to drive by Bradley's, and let Bill Bradley have the gun back. Thinking that the deputy sheriff had got the matter settled, he drove up in front of Bill Bradley's store, never thinking about going to the garage of the deceased, but when he got out he remembered that the deceased's garage was right next to Bradley's store. Wanting to be certain that, when he went home, the thing was all settled and that nobody had anything against him, feeling that he had done no one any harm, he thought he would step into the garage, ask the deceased if he properly understood it, and that if there was anything he did not understand he would explain it. He walked into the garage and saw the boys who had testified for the State. He was in a good humor, had no ill will against anybody, spoke to them pleasantly and said good morning; and they spoke to him. He walked on down on the left side of the car, like these boys had described it in their testimony, came around on the right, spoke to them, and asked if Mr. Treadwell was in the garage. Treadwell did not speak. He did not know Treadwell at the time. Brooks said, " That is him over there," pointing to the deceased, who was sitting on the right-hand side of the front seat of the automobile. By that time he had walked around on the right-hand side of the car, and when he got even with the front wheel he said, " Are you the man that was up at the hotel the other night to shoot me? " He said this in a quiet, ordinary tone of voice. He did not know which was which at the time. The deceased had something in his hand. As soon as he looked up and recognized the defendant he ran his hand in his bosom ". this way " (indicating), and the defendant thought he was trying to get his pistol. The defendant had his in his left hip-pocket. He got it out, and fired the first shot from his hip as he got out with it. He fired only three shots, but others say four. He is satisfied that the other shot came from the de-

ceased's own gun, because he was sure the deceased grabbed it just as he asked him that question. The deceased reached his hand in his bosom "that way" (indicating), and he is sure the deceased had his hand on the butt of that gun when the bullet of his first shot struck the arm of the deceased.

Witnesses for the defendant, who saw him as he arrived in Chatsworth that morning and afterwards, in the short interval between his arrival and the homicide, testified that he was apparently in a good humor, and was smiling as he saluted them. There was evidence that the defendant was sober at the time of the homicide. .

W. S. Bradley testified for the defendant that on May 29, 1920, he was in business in Chatsworth on the corner next to the garage of the deceased. The first he knew of any shooting in the garage was when he heard the four shots fired. Less than a minute after the shots the defendant came into the store, with a pistol in his right hand, holding it down, and it was still smoking. Witness asked him what he had done, and he said he had killed the deceased. Witness took the defendant to be sober. The manner of the defendant was normal and natural when he came in.

Alvin Jones, a witness for the defendant, testified, that he was a minister of the gospel. He was the proprietor of the De Soto Hotel in Chatsworth. The defendant spent the night there on Wednesday before the deceased was killed. · Met the defendant the next morning at the breakfast-table, and told him about the threats that had been made by the deceased the night before. Told him the deceased had been threatening his life and had been hunting for him. Told him the deceased had threatened to kill him. Heard the deceased say he would kill the " God damned son of a bitch," and heard him say that in the hotel. Told the defendant what he saw the night before. Told him about the deceased's threats there in the lobby, and about his conduct. Told the defendant, in the talk with him the next morning, what Miss Jones had said. Does not remember that he told the defendant anything about the pistol. Heard Ora Bell and Clarisse telling the defendant at the breakfast table of the threats. They told him that the deceased had said he would kill him on first sight, " the damned son of a bitch," and if he did not get him that night he would kill him and draw him. They told the defendant these

things in witness's presence. They told the defendant about how they put him out of the hotel, and kept him away from the defendant's room, and about how they had taken the pistol away from the deceased. Does not remember whether they said they took the pistol from the deceased or from Mr. Swinney.

Miss Ora Bell Jones, witness for the defendant, testified, that she was the daughter of Alvin Jones. She lived at the De Soto Hotel on May 29, 1920. On the Wednesday night before that she was in the hotel when the deceased came in. It was after midnight. She was with Miss Treadwell and Drs. Swinney and Munford on the trip coming from Cohutta Springs. The defendant brought them from Crandall to Chatsworth. Miss Treadwell, Drs. Munford and Swinney, and she got in the defendant's car at Crandall. Dr. Munford's car, in which they were riding, was broken down, and Dr. Swinney got the defendant to bring them from Crandall. She was sitting on the front seat with the defendant. Drs. Swinney and Munford and Miss Treadwell were sitting on the back seat. On reaching the underhead crossing this side of Crandall, the defendant stopped his car under this viaduct and remarked that he was going to take a drink. He reached back in his pocket, she supposed, to take a bottle out of his pocket. Miss Treadwell objected to his taking a drink, and jumped out of the car. The defendant remarked that he was not going to hurt any one. Miss Treadwell said, that, if he was going to drink, he would turn the car over. The defendant laughed, and said he would turn the car over and kill every damned one in the car. About this time Miss Treadwell jumped out of the car, and ran up in front of the car, and Dr. Swinney followed her. After she got out the defendant asked what that meant. She told him that Miss Treadwell objected to his taking a drink, but that she would get back in the car when he overtook her. Dr. Munford thought she would get back in. When they overtook Dr. Swinney and Miss Treadwell the defendant slowed down his car and asked them to get back in, said he was going to bring Dr. Munford and herself on into Chatsworth, and for them to come on. Dr. Munford said, " Get in the car; there is no use acting a fool like this," and she said, " You all get in." Dr. Swinney said, no, they would walk on; he would get a car at Eton and come on. Dr. Swinney and Miss Treadwell refused to get in. The defendant did not register at

the hotel. When she looked over the register she saw the rooms were all occupied. She said to Dr. Munford, the defendant "has been kind enough to bring us in, and he will have to spend the night." Dr. Munford said to the defendant, "Go with me upstairs, and I will find a room for you." Told the defendant the deceased was there looking for him, that the deceased had been misinformed, that he was under the impression that his sister had been insulted and offered a drink of whisky. Told the defendant they all knew it was a mistake, and told him he ought to see the deceased. Told her father about the conduct of the deceased in the hotel the night before. Told her father that Smith was the maddest man she ever saw, that he was there cursing the defendant and saying that no God-damned son of a bitch could insult his sister or give her a drink of whisky. Told her father the deceased had been misinformed. Told the defendant that the deceased was looking for him. The defendant said he was willing to apologize to Miss Treadwell for whatever he might have done, that he had done nothing wrong, that he was willing to get down on his knees if necessary. She suggested that she would call up Miss Treadwell and he could offer an apology over the telephone. She did so. The defendant talked to her. He made himself known over the telephone, and said he was willing to apologize for what happened the night before. Witness could not hear what she said in reply. Smelled whisky on the defendant when he got in the car at Crandall. Could not tell by his acts and conduct that he was under the influence of whisky. He did not stop afterwards and say, "We will all take a drink." Held his bottle in this position (indicating), but he did not offer any. Two other men were in the room where the defendant stayed on Wednesday night before the killing. Saw the room, but do not know whether the defendant stayed in that room or not. Saw the room where Mr. Mattingley stayed. They had vomited in the room. There were two beds in the room, and there was vomit on both beds, and a large place on the floor by the side of each bed. Did not find any whisky. Saw that room about four o'clock the next afternoon, after these two men had checked out. The defendant left there soon after breakfast between seven and eight o'clock. He was not drunk; he was sober. When these men left, witness found the room in the condition described. Does not know who vomited in the room. In con-

versation between Mr. Bagley and the witness, in the defendant's presence, Mr. Bagley (the deputy sheriff) assured Mr. Vincent he would fix the trouble with the deceased. Defendant asked him to do that.

Mrs. Alvin Jones, a witness for the defendant, testified that on Wednesday and Thursday before May 29, 1920, she was living at the De Soto hotel. The defendant was there part of Wednesday night and Thursday morning. Did not tell the defendant what the deceased said about him the night before. Told her husband all she had heard Smith Treadwell say. Told her husband that when Smith Treadwell went out he said he would kill the defendant, that he had better not be there the next morning, and then when he stopped outside of the porch he spoke to somebody else and said he would get the defendant if he ever saw him, and called the defendant a son of a bitch.

The pistol found on the body of the deceased after the killing was introduced in evidence.

J. J. Bates, a witness for the defendant, testified: He is one of the counsel for the defendant. Was present at the undressing of the deceased at his mother's home after he was shot. In removing some of his clothes a pistol rolled out on the cot. It came from somewhere back between his shoulders and the waist of his pants. Ben Bates had him by the right hand and Mr. McGinty by the left, and we were turning him over, and the pistol rolled out. Looked at the wound in the right arm of the deceased. It had entered his right arm somewhere near the point of the elbow, and came out on the front side of the arm here (indicating), angling across the arm in that shape (indicating).

Ralph Harris, a witness for the defendant, testified, that he was living at the De Soto hotel in Chatsworth on May 29, 1920. Identifies pistol presented to him. He gave this pistol to the deceased before his death. He thinks it was on the night of the twenty-sixth; that was on Wednesday night before his death. Gave it to the deceased about the door of the hotel over here, or on the porch about the door. Was not served with a subpœna duces tecum to produce the pistol when the case was tried before, but he noticed one was out for him. Don't remember who got him to go and get this pistol. Went to the home of Dr. A. K. Gregory, of Dalton, and got it. He is a first cousin of the deceased. Had

seen that pistol on Wednesday night, the twenty-sixth, before he gave it to Smith Treadwell. Saw it in the hotel. Mr. Neely got it from Mr. Swinney. After I got it I gave it to the deceased, as he was leaving the hotel.

Roy Baggett, a witness for the defendant, testified: I was at work on the twenty-ninth of May, 1920, the day the deceased was killed, at the garage of the deceased. At the time the defendant came into the garage I was in there, was sitting on the running-board of an Auburn-Six car. The deceased was sitting on the right hand side of the front seat. When the defendant came in witness was sitting on the running-board right at the front door of the left-hand side. His back was turned to the deceased. When the defendant came in he was sitting on the floor board, where you put your feet, in the left-hand front door. When he first came in the front door was open. Witness got out of the car and sat down on the running-board. His back was against the car. Was not there when the defendant came into the shop. After the defendant came in witness was in that position on the running-board. At the time the defendant came in, Walter Johnson was standing back toward the door on the left-hand side against the front door of the building. He was standing back about the rear seat of the automobile, on which witness was sitting, and the deceased was in it. The rear end of the car was toward the west. With reference to that seat, Mr. Johnson was standing back here on that side. Mr. Brooks was standing pretty close to Slim Johnson. At the time witness was closer to Smith Treadwell than either Johnson or Brooks. When he heard the first shot he got up, and it fired three or more times, and he left. Slim Johnson was gone. Brooks went out first, then Slim Johnson, Wiley Bradley, and witness. Does not know what time Johnson left, but thinks he left there during the shooting. The defendant said, " Good morning, gentlemen," when he came in. Mr. Brooks, witness thinks, was the man that spoke. Never heard Smith Treadwell speak. When the defendant said, " Good morning, gentlemen," he then asked where the deceased was. The deceased did not speak then, but thinks Mr. Brooks spoke then. The defendant then walked up to the front door of the car and stopped, and said, " Is this Smith Treadwell? " Did not hear the deceased say anything in reply. Don't know what the defendant did then. Had his back to him. Didn't see any of the balance of it.

Jim Bagley, a witness for the State, testified, that on Thursday morning before the killing of the deceased, he was in Chatsworth. Saw the defendant that morning. Saw him near the deceased's garage. Walked down there and spoke to the defendant. He asked me where the sheriff was. Told him he was gone to Milledgeville. He said, " You will do as well." He said, " I want you to go to the hotel with me." He said, " We will go by the drug-store. I want to get Dr. Swinney." We went to the drug-store, but Dr. Swinney was not there. We then went to the hotel. Took the defendant to be drinking a little. We went upstairs in the hotel and got a drink. There was a half gallon grape-juice bottle full, and a pint grape-juice bottle. Two strangers were there in bed when we got there. Witness and the defendant took a drink together. He asked me to see the deceased and to make up his trouble about him insulting his sister. Told him I would, and I did. Witness and Mr. Neely went to the garage, called the deceased out, and told him the defendant called Miss Thelma over the telephone and said he had apologized to her, that the witness had heard him talking over the telephone to her, and told the deceased that the defendant asked witness to come to see him, and that he told him he would, and that he (witness) was satisfied everything would be straight with the deceased. At that time the defendant had gone to Crandall. The deceased said that was perfectly all right with him, that he would have no more to say about it, and that would settle the thing with him; if he would apologize to his sister that would be all right; that he did not know just in what way the defendant had insulted her that night. The defendant did not come back to witness to know what he had done. Never saw him any more after he left here Thursday morning, until Saturday morning in the garage.

*J. J. Bates, Neel & Neel,* and *Morris & Hawkins,* for plaintiff in error.

*George M. Napier, attorney-general, J. M. Lang, solicitor-general, Seward M. Smith, asst. atty.-gen., C. N. King, H. H. Anderson, E. H. Clay,* and *Maddox, McCamy & Shumate,* contra.

HINES, J. (After stating the foregoing facts.)

1. In the first ground of his amendment to his motion for new trial the defendant alleges that the court erred in refusing to

permit W. T. Brooks, a witness for the State, to answer a question propounded to him by counsel for the defendant. This witness was asked if the defendant, on entering the place of business of the deceased on the occasion of the homicide, did not appear to be speaking good naturedly and in good humor, and was smiling, when he addressed the deceased and those with the latter. Counsel for the State objected to this question, on the ground that it was incompetent, and that the witness should state how the defendant appeared. The court sustained the objection and refused to permit the witness to answer this question. This was error. The conduct, manner, and appearance of the defendant, whose actions and utterances are parts of the res gestæ, are relevant evidence; and the witness may testify to such conduct, manner, and appearance, without giving the facts upon which he bases his statement. The witness could state that the defendant was smiling, without telling the jury how he knew he was smiling. He could testify that the defendant spoke good naturedly, without narrating the facts on which he based his opinion. *Leary* v. *Leary,* 18 *Ga.* 696; *Travelers Ins. Co.* v. *Sheppard,* 85 *Ga.* 751 (8), 778 (12 S. E. 18); *Roberts* v. *State,* 123 *Ga.* 146 (6), 161 (51 S. E. 374); *Glover* v. *State,* 15 *Ga. App.* 44 (5), 54 (82 S. E. 602). But it appears from the brief of evidence that this witness, on his cross-examination, testified that the defendant apparently spoke pleasantly when he saluted the deceased in the garage at the commencement of the rencounter which ended in this homicide. While the court first refused to admit this evidence, he must have subsequently admitted it; and this cured any error in its prior rejection. *Woods* v. *State,* 137 *Ga.* 85 (3) (72 S. E. 908).

2. We will take up next the second, fourth, fifth, sixth, and ninth grounds of the defendant's amendment to his motion for new trial. These grounds deal with the rulings of the court upon the admissibility of evidence of previous threats made by the deceased against the defendant, and of the admissibility of evidence touching the conduct of the deceased toward the defendant on Wednesday night prior to the homicide on the following Saturday. Touching the second ground it is sufficient to say that the witness, W. T. Brooks, who was a witness for the State, did not know of any threats made by the deceased toward the defendant, or of any hostile conduct on the part of the deceased toward the

defendant. This disposes of this ground. In the fourth ground it is complained that the court erred in refusing to permit Ralph Harris, a witness for the defendant, to testify that the deceased had, on the previous Wednesday, threatened to kill the defendant, and had armed himself with a pistol for this purpose. The court ruled that, in the then state of the record, this testimony was not admissible, and would not be until there was some evidence before the court of the commission of an overt act on the part of the deceased at the time of the killing. The court further ruled that whether such evidence would become admissible, after the defendant had made his statement, would be passed on then by the court. This witness for the defendant was sworn before the defendant had introduced any evidence, or had made any statement, concerning the circumstances accompanying the commission of this homicide. He was likewise sworn before there was any proof that knowledge of these threats or of this hostile conduct had been brought to the knowledge of the defendant.

As a preliminary foundation to the admissibility of an uncommunicated threat by the deceased against the defendant, it must be shown that the deceased was the assailant in the fatal encounter, or did some overt act showing an intention to carry that threat into execution. *Lingo v. State*, 29 *Ga.* 470 (2) ; *Hoye v. State,* 39 *Ga.* 718; *Peterson v. State,* 50 *Ga.* 142; *Vaughn v. State,* 88 *Ga.* 731· (16 S. E. 64) ; *Trice v. State,* 89 *Ga.* 742 (15 S. E. 648) ; *May v. State,* 90 *Ga.* 793 (17 S. E. 108) ; *Pittman v. State,* 92 *Ga.* 480 (17 S. E. 856) ; *Nix v. State,* 120 *Ga.* 163 (2), 165 (47 S. E. 516) ; *Pride v. State,* 133 *Ga.* 438 (66 S. E. 259) ; *Rouse v. State,* 135 *Ga.* 227 (4-a), 228 (69 S. E. 180) ; *Warrick v. State,* 125 *Ga.* 133 (53 S. E. 1027).

The proper foundation for the admission of uncommunicated threats can not be laid by the defendant's statement alone. *Vaughn v. State, Pride v. State, Rouse v. State,* supra.

As the proper preliminary foundation had not been laid at the stage of the case when the court rejected this testimony, the ruling complained of in this ground was not erroneous.

In *Peterson v. State,* 50 *Ga.* 142, Judge McCay said, " The *Keener* case carries the question of the admissibility of such testimony to the point of extreme liberality, and is difficult to reconcile with *Howell's case,* 5 *Georgia,* and *Monroe's case,* 5 *Georgia.* We

do not feel authorized to go any further in the direction of the *Keener* case than its terms require."

When the evidence leaves it doubtful as to which of the parties began the mortal combat, and there is testimony tending to show that the slayer killed his adversary in self-defense, evidence of this character may be received to show the state of mind or feeling on the part of the deceased, and thus illustrate his conduct and throw light upon his intention and purpose in the fatal encounter. " This," this court has said, " is the substance of what is ruled in the case of *Keener* v. *State,* 18 *Ga.* 194." *May* v. *State,* 90 *Ga.* 793, 797 (17 S. E. 108). These cases do not conflict with the general rule above stated, that uncommunicated threats made by the deceased toward the defendant are not admissible, unless the deceased was the assailant or provoked the difficulty, or unless the question of who provoked the difficulty is in doubt.

The court erred in refusing to permit A. J. Collins, a witness for the defendant, to testify that on Wednesday night before the homicide on the next Saturday, he was in the northwest corner room of the Jones hotel, asleep, when he was awakened by a voice which he did not know, saying, " You G — d — d s — of a b —, you are in one of these rooms, and if you show your face I will kill you; if I can't find you I will go down stairs, look on the register and see what room you are in," and that later he heard the same voice saying, " If I can't find you to-night, I will get you to-morrow." The witness stated that he did not communicate these threats. There was evidence by other witnesses that these threats were made by the deceased toward the defendant, and that they had been communicated to him prior to the homicide. This witness was sworn after the defendant had made his statement. In view of this situation we are of the opinion that this evidence was admissible to corroborate the testimony of the other witnesses who swore that these threats had been made. The fact that they had not been communicated by this witness to the defendant does not render them inadmissible, as they had been communicated to the defendant by other witnesses who heard them.

3. In the seventh ground of the defendant's amendment to his motion for new trial, it is claimed that the court erred in requiring Ora Bell Jones, a witness for the defendant, on cross-examination, to testify, over objection of the defendant, that in the room at the

Jones hotel occupied by the defendant and two other men, one of whom was a man by the name of Mattingley, on Wednesday night before the homicide, there were two beds, on both of which there was vomit and a large place of vomit on the floor by the side of each bed. The objection to this testimony was that it was irrelevant and immaterial. We think this testimony was irrelevant. It threw no light on the question being tried by the jury. Was it harmful error ? In view of the evidence, we can not say that the admission of this irrelevant testimony was not prejudicial to the defendant. It was calculated to prejudice his case in the eyes of the jury, and should have been excluded.

4. In the tenth ground of this amendment it is urged that the court erred in interrupting the defendant while making his statement, under the circumstances which will now be stated. After the defendant had stated, " We tried this case once before, tried it last August. We had twelve men on the jury like we have this afternoon," the court interrupted him and said, " Don't go into what occurred last August; that is no part of this case." The defendant then whispered to the judge that he was going to state that the jury (on the previous trial) stool eleven to one for his acquittal. The court then stated that he could not make that statement. It is insisted that this ruling deprived the defendant of his right to make such statement as he deemed proper in his own defense, and that he had a right to do this without being restricted or governed by the rules controlling the admissibility of evidence.

The prisoner has " the right to make to the court and jury such statement as he may deem proper in his defense." Penal Code, § 1036. The court may so far control his statement as to prevent long, rambling, and irrelevant matter. Yet as to all matters connected with the case he may make such statement as he thinks proper, and should not be restricted to stating such facts as would be admissible in evidence. *Coxwell* v. *State*, 66 *Ga.* 309 (5); *Hackney* v. *State*, 101 *Ga.* 512, 519 (28 S. E. 1007); *Richardson* v. *State*, 3 *Ga. App.* 313 (59 S. E. 916).

While considerable latitude has been allowed the defendant in making his statement, he has never been allowed to state matters wholly irrelevant, or such as would be violative of every rule of evidence. *Montross* v. *State*, 72 *Ga.* 261 (4-*a*), 266 (53 Am. R. 840); *Howard* v. *State*, 73 *Ga.* 83 (2). The judge may interrupt

the defendant when he makes irrelevant statements, and instruct him to confine his statement to the case. *King* v. *State, 9 Ga. App.* 609 (71 S. E. 943).

While the presiding judge, in the exercise of a sound discretion, can. require the accused to omit from his statement reference to entirely irrelevant matters, it is not contemplated by our law that he should be embarrassed and circumscribed by the rules which control the admissibility of evidence. *Hackney* v. *State,* supra. *Tiget* v. *State,* 110 *Ga.* 244 (34 S. E. 1023).

How the jury stood on the former trial of this case was wholly irrelevant to the present trial. It could throw no light whatever on the issue being tried. So the court did not err in interrupting the defendant and instructing him that he could not make any statement to the jury on this subject.

5. In the thirteenth ground of the motion for new trial, the defendant insists that the court erred in charging the jury as follows: " I charge you that the defendant had a right to go peaceably, on a peaceful mission, into the place of business of Treadwell, provided he did not expect as a reasonable man that his presence there would be unwelcome to Treadwell and would provoke a difficulty. He had no right· to arm himself and go to the place of business of deceased, if he ought to have expected as a reasonable man that his presence there would be unwelcome and would provoke a difficulty." The defendant asserts that this excerpt from the charge is not a correct statement of the law; that the language, " provided he did not expect as a reasonable man that his presence there would be unwelcome and would provoke a difficulty," nullified the correct statement of the law given in the first part of the charge; that this language tended to inflame the jury against him; that the language " he had no right to arm himself and go to the place of business of the deceased, if he ought to have expected as a reasonable man that his presence there would be unwelcome and would provoke a difficulty," is an incorrect statement of the law, and was especially prejudicial and hurtful to him; that, as the place of business of the deceased was a public place, he had a right to go there upon a peaceful mission, and that this charge placed him beyond the protection of the law. We do not think that this charge correctly states the law on this subject. The right of the defendant to seek an interview with the deceased de-

pended, not on the soundness of his judgment in determining the consequences thereof, but upon the intent with which he sought such interview. If his mission was peaceful and for the purpose of bringing about a reconciliation between himself and the deceased, and not for the purpose of provoking a difficulty, in order to avenge himself for the conduct of the deceased at the hotel on the previous Wednesday night, he would not put himself beyond the pale of the law, although he may have exercised bad judgment in this matter. If the object of his interview was a hostile one, for the purpose of seeking revenge, or to kill the deceased, then he would have been the provoker of the difficulty; and having provoked it, he could not rely upon the conduct of the deceased under such circumstances to justify the homicide. *Roberts* v. *State,* 65 *Ga.* 430. The fact that the defendant armed himself, if this was not for the purpose of attack, but for the purpose of defense, would not deprive him of his right to seek a peaceful interview with the deceased. Thompson *v.* U. S., 155 U. S. 271 (15 Sup. Ct. 73, 39 L. ed. 146).

6. In the seventeenth ground of the motion the following charge is complained of: " Legal malice is the intent unlawfully to take away the life of a human being. Malice may be presumed from the use of a deadly weapon in a way and manner likely to produce death. If you find from the evidence that on the occasion under investigation the defendant shot and killed Smith Treadwell, and that in so doing he was actuated by malice, either express or implied, according to the definition of express and implied malice given you in charge, the defendant would be guilty of the offense of murder, and it would be your duty to so find." The errors assigned are, (1) that the language, " Legal malice is the intent unlawfully to take away the life of a human being," is an incorrect statement of the law, and (2) because it eliminates premeditation as the essence of murder. This definition of malice is incorrect. It eliminates all idea of deliberation or premeditation. It instructed the jury that the intent to kill and the unlawfulness of the killing constituted malice. It requires the unlawful, intentional killing of a human being with malice to constitute murder. An unlawful, intentional killing, without malice, would amount to voluntary manslaughter. *Dowdy* v. *State,* 96 *Ga.* 653 (23 S. E. 827).

Malice is the deliberate intent unlawfully to take away the life of a fellow creature, and may be express or implied. *Jones* v. *State,* 29 *Ga.* 594, 607; *Bailey* v. *State,* 70 *Ga.* 617; *Carson* v. *State,* 80 *Ga.* 170 (5 S. E. 295); *Taylor* v. *State,* 105 *Ga.* 746 (31 S. E. 764); *Mann* v. *State,* 124 *Ga.* 760, 766 (53 S. E. 324, 4 L. R. A. (N. S.) 934); *Worley* v. *State,* 136 *Ga.* 231 (71 S. E. 153); *Curry* v. *State,* 150 *Ga.* 736 (105 S. E. 361).

7. In the nineteenth ground of the motion exception is taken to this charge: " If you find that the deceased had threatened the life of the defendant, and had a pistol for the purpose of killing him, that would not justify the defendant in going to the deceased's place of business with the intent to kill him, and, in pursuance of such intent, taking his life." The errors assigned are, (1) that this instruction is not a correct statement of the law; (2) that the language, " that would not justify the defendant in going to the deceased's place of business with the intent to kill him, and, in pursuance of such intent, taking his life," is erroneous (*a*) because not based upon the evidence, (*b*) is argumentative, and (*c*) amounts to an expression of opinion by the court that the defendant went to the place of business of the deceased to kill him, and, in pursuance of such intent, took his life. None of the exceptions to this charge are good, unless the language of the latter part thereof amounts to an expression or intimation of opinion by the court. The language, " that would not justify the defendant in going to the deceased's place of business with the intent to kill him, and, in pursuance of such intent, taking his life," does amount to an expression or intimation of opinion by the court that the defendant went to the deceased's place of business with the intent to kill him, and in pursuance of such intent did take his life. As this instruction did assume as true these facts, it would for that reason be objectionable, and requires the grant of a new trial. *Vaughn* v. *Miller* 76 *Ga.* 712 (1-*b*).

8. In the twenty-first ground the defendant complains that the court erred in failing to give in charge to the jury section 76 of the Penal Code. Where the court fully instructed the jury as to the law of justifiable homicide, and its effect upon their verdict, the failure to charge this section was not error. *Robinson* v. *State,* 118 *Ga.* 198 (4) (44 S. E. 985); *Taylor* v. *State,* 121 *Ga.* 348 (10), 356 (49 S. E. 303); *Worley* v. *State,* supra.

9. In the twenty-second and twenty-third grounds the defendant alleges that the court erred in failing to give in charge to the jury the law of voluntary manslaughter. Is voluntary manslaughter involved in this case, under the evidence ? On Wednesday night, prior to the homicide on Saturday following, the deceased became enraged because of certain conduct of the defendant on the automobile trip from Crandall to Chatsworth, which offended the sister of the former. The deceased went to the hotel where the defendant was stopping, cursed and abused the defendant, but not in the presence or hearing of the latter, threatened to kill him, and stated that if he did not get him that night he would get him the next day. These threats and this conduct of the deceased were made known to the accused the next morning. The following Saturday morning the defendant went to the garage of the deceased. When he went into this garage the deceased was sitting in an automobile, patching an inner tube. W. T. Brooks, Walter Johnson, and Roy Baggett were around the car in which the deceased was sitting. When the defendant came in he said, " Good morning, gentlemen," He asked if Mr. Treadwell was in. There was no reply to this question. The defendant then walked around to the right side of the car, stood about even with the windshield, and said, " Smith Treadwell, you are the man that was looking for me the other night, wasn't you ? " and then pulled out his gun and went to shooting the deceased. When the deceased was shot he was pulling the patch off an inner tube. The deceased did not say anything to the defendant. When the first shot was fired he looked up for the first time. The eye-witnesses did not see any movement on the part of the deceased when this shot was fired. The defendant shot the deceased four or five times. This is the State's theory of the homicide, as proved by the eye-witnesses.

The defendant's account of the fatal tragedy is as follows : " I walked in the garage and saw these boys that have testified. I was in a good humor, had no ill will or ill spirit against anybody. I spoke to them pleasantly, said, " Good morning," and they spoke to me, and I walked on down on the left side of the car, like these boys described it to you, came around on the right and spoke to them, and asked if Mr. Treadwell was in the garage, and Smith Treadwell didn't speak. I did not know him at the time, and Mr. Brooks says, ' That's him over there,' pointing to Smith Tread-

well, who was sitting on the right-hand side of the front seat. By that time I had walked around on the right-hand side of the car, on the south side; and when I got even with the front wheel there, I says, ' Are you the man that was up at the hotel the other night to shoot me ? ' just in a quiet, ordinary tone of voice. I did not know which was which at the time, and he had something in his hand, and soon as he looked up and recognized me he ran his hand in his bosom this way [indicating], and I thought he was trying to get his pistol. I had mine in my left hip-pocket. I got it out; in firing I fired that first shot from my hip as I came out with it. I fired only three shots, I am satisfied in my own mind; some of them say four, and some three. I am satisfied that other shot came from Smith Treadwell's own gun, because I am sure he grabbed it just as I asked him that question. He reached his hand in his bosom there [indicating], and I am sure he had his hand on the butt of that gun when that bullet struck his arm here [indicating]."

The evidence for the State makes a clear case of unjustifiable homicide. The statement of the defendant tends to establish justifiable homicide based upon his right to defend himself against one who was manifestly intending or endeavoring, by violence or surprise, to commit a felony on his person or to take his life, and based upon the doctrine of reasonable fears. If manslaughter is involved in this case, it arose from the statement of the defendant alone; and it was not error for the court to fail to charge upon any theory of defense which rested alone upon his statement, in the absence of a timely written request by the defendant to the court to charge thereon. *Felder* v. *State,* 149 *Ga.* 538 (101 S. E. 179) ; *Roberts* v. *State,* 143 *Ga.* 71 (84 S. E. 122) ; *Griggs* v. *State,* 148 *Ga.* 211 (96 S. E. 262) ; *Pollard* v. *State,* 144 *Ga.* 229 (86 S. E. 1096).

10. In the thirty-third ground the defendant complains of the refusal of the court to give in charge to the jury the following, on written request: " I charge you, gentlemen of the jury, that in arriving at a correct conclusion in homicide cases, the killing should be viewed from the defendant's standpoint." This request does not embody a correct principle of law. The initial viewpoint or standpoint of the jury is that of the law, which presumes that the defendant is innocent, and which puts on the State the burden

of rebutting this presumption and of establishing his guilt beyond a reasonable doubt. In determining whether the State has carried this burden, the jury must view the case from all angles and all standpoints. They must view the case from the standpoint of the State, as disclosed by its evidence. They must view the case from the standpoint of the defendant, as disclosed by his evidence and his statement. They must view the whole case with the view of ascertaining the truth, which is the object of all legal investigation. When the defense is set up that the circumstances surrounding the slayer are sufficient to excite the fears of a reasonable man that his life was in danger or a felony was about to be committed upon his person, and that the slayer acted under the influence of those fears and not in a spirit of revenge, the question has been raised as to from what standpoint the jury should consider the case. Whether the belief that the danger is apparently imminent is to be viewed from the standpoint of the defendant, or from that of a reasonable man, or from that of the jury, has been much mooted. 13 R. C. L. 817, § 122. To justify a homicide, the fears of the slayer must be those of a reasonable man, one reasonably courageous, reasonably self-possessed, and not those of a coward. *Teal* v. *State,* 22 *Ga.* 76 (68 Am D. 482); *Gallery* v. *State,* 92 *Ga.* 464 (3) (17 S. E. 863); *Dover* v. *State,* 109 *Ga.* 485 (34 S. E. 1030); *Coleman* v. *State,* 141 *Ga.* 731 (5) 736 (82 S. E. 228); *Williams* v. *State,* 145 *Ga.* 177 (88 S. E. 958); *Smoot* v. *State,* 148 *Ga.* 306 (96 S. E. 561). Under these decisions the killing must be viewed from the standpoint of a reasonably courageous man. If the defendant happens to be a man not reasonably courageous, then the killing can not be viewed from his standpoint. The law makes no discrimination in favor of a drunkard, a coward, or any particular individual; but the circumstances must be such as to justify the fears of a reasonable man. *Golden* v. *State,* 25 *Ga.* 527. Our Penal Code declares that the fears must be those of a reasonable man. Penal Code, § 71.

In *Monroe's* case, 5 *Ga.* 85, 138, the court said: " We must substitute ourselves in the shoes of the defendant." But this question was not raised in that case; and so far as our limited investigation has gone, this particular point has not been raised in any decision rendered by this court. Section 71 of the Penal Code fixes the standard by which the sufficiency of fears to justify a killing must

be determined. "It must appear that the circumstances were sufficient to excite the fears of a reasonable man." In the cases cited above, this court has held that such fears must not be those of a coward, nor those of a drunkard. They must measure up to those of a reasonably courageous man. A defendant may kill another. honestly believing that it is necessary to kill to save his own life, or to prevent the commission of a felony upon his person; and yet he would not be justified, if the circumstances surrounding him at the time were not sufficient to excite the fears of a reasonable man. A timid man may kill, honestly believing that his life is in danger or that a felony is about to be committed upon his person. Still he will not be justified unless his fears come up to the standard fixed by this section of the Penal Code. The prevailing rule in America seems to be "that the apprehension of danger and belief of the necessity which will justify killing in self-defense must be a reasonable apprehension and belief, such as a reasonable man would under the circumstances have entertained." 13 R. C. L. 818, § 122; Pinder v. State, 27 Fla. 370 (8 So. 837, 26 Am. St. R. 75); State v. Beckner, 194 Mo. 281 (91 S. W. 892, 3 L. R. A. (N. S.) 535); State v. Duncan, 86 S. C. 370 (68 S. E. 684, Ann. Cas. 1912A, 1016); Nash v. U. S., 229 U. S. 373 (33 Sup. Ct. 780, 57 L. ed. 1232). This rule seems to be in consonance with section 71 of the Penal Code and with the decisions of this court above referred to. So the court, in our opinion, did not err in refusing to instruct the jury on this subject as requested by the defendant.

11. Many questions are raised in the forty-three grounds of the motion for new trial in this case. We have given careful and laborious attention to all of them. Some, such as the remark made by a bystander in the presence of the jury, as coming from the judge, and some which refer to the incompetency of some of the jurors to try the defendant because of undue bias and prejudice against him, can not arise on the next trial of this case. Others refer to requests to charge, which were covered by the general charge. Other grounds complain of rulings in which we find no error. For these reasons we do not refer to them specifically.

As a new trial is granted in this case, we make no ruling on the evidence.

*Judgment reversed. All the Justices concur, except Gilbert, J., dissenting from the ruling in the 7th headnote.*