## WILSON v. THE STATE.

No. 7166. June 12, 1929.

*B. F. Walker, J. C. Newsome,* and *E. P. & J. Cecil Davis,* for plaintiff in error.

*George M. Napier, attorney-general, M. L. Felts, solicitor-general, T. R. Gress, assistant attorney-general,* and *J. B. & T. R. Burnside,* contra.

ATKINSON, J. Gordon Wilson was indicted for the murder of Johnny Hogan by shooting him with a pistol. The jury returned a verdict finding the defendant guilty, and recommending mercy. The defendant's motion for a new trial was overruled, and he excepted.

Mrs. Monnell English, with her two unmarried daughters Ruth and Arvel, maintained a home at which the defendant Gordon Wilson boarded and resided. A witness, Willie Lee Kitchens, testified that at night, while witness and deceased and several others including defendant and Mrs. English and her daughter Ruth were in a room of their home, the defendant knocked Mrs. English down, and when Ruth came to the assistance of her mother he knocked her down and drew his pistol and said that if any one did not like it "to step out in front of him." Johnny Hogan had not "done or said anything" to defendant, nor did he then "do or say anything" to him. The sheriff, who lived near the English home, delivered testimony to the effect that on the night in question he went to the English home and found the prostrate body of Johnny Hogan, who had been shot through the heart with a pistol and killed; that the reason he went over there was that "Miss Ruth English came to my house and woke me up and told me Gordon was over there beating on her, and wanted me to go around there;"

that he did not go immediately, but told Ruth to get the town marshal. However, having received "some further communication," witness went around there after about thirty or forty minutes, where he found the body of Johnny Hogan as indicated above. The attorneys for the defendant objected to that part of the testimony of the sheriff relating to the request made by Ruth English which is quoted above, without stating the ground of objection. The court announced that he would sustain the objection; whereupon the solicitor-general stated that the evidence was admissible for the purpose of showing why the sheriff went over there. The judge then stated that he would admit the evidence solely for the purpose of explaining the sheriff's conduct. The third ground of the motion for new trial complained of the admission of the evidence, "because it was hearsay and contained a direct affirmative statement that Gordon, the defendant, was over there beating on this woman," and that the admission of the evidence was prejudicial and harmful to the defendant. Subsequently the defendant moved to rule out the same evidence, "on the ground that the sheriff did not act on it." The court overruled the motion. The fourth ground of the motion for new trial complains of this ruling and assigns error thereon, because the evidence "was clearly hearsay and conveyed a purported fact through the medium of hearsay evidence, which was very damaging to the defendant." It is stated in the motion for new trial, with reference to these two grounds, that the objection to the evidence "is not clearly stated, but the fact that the trial judge first sustained the objection . . shows clearly that the judge understood that the ground of objection urged was that it was hearsay." This statement in the motion for new trial is a conclusion that does not necessarily follow. It is the rule of practice that where an objection is interposed to the admission of evidence, or a motion is made to rule out evidence that has been admitted, the party must at the time of invoking the ruling state the ground of objection, and where that is not done it will not suffice to state the grounds of objection subsequently in his motion for a new trial. In so far as the third and fourth grounds of the motion for new trial seek to raise the question that the testimony of the sheriff was hearsay, they are insufficient to present such question for consideration. In so far as the fourth ground of the motion for new trial alleges that the evidence should

be excluded because it appears that the sheriff did not act upon the request of Miss Ruth English to go to the English home, it is without merit.

■ The ruling announced in the second headnote does not require elaboration.

■ There was evidence that Everett Hogan, the brother of the deceased, was a frequent visitor at the English home; that on the evening of the homicide Ruth English went with Everett Hogan to his home, and the defendant went with Mrs. English to the Hogan home for the purpose of bringing Ruth to her own home; that Ruth protested; that defendant and Mrs. English started on their return, and the latter told Ruth to come home; that a little later Mrs. English and another person and the defendant started in an automobile back to the Hogan home for Ruth, and on their way met Ruth and Everett, and with some persuasion took Ruth in the automobile, leaving Everett alone. They returned to the English home, and about 7:30 o'clock Johnny Hogan went to the English home, and, so far as appears from the evidence, remained there until the time of the homicide, which occurred about 10 or 11 o'clock at night. The residence was a small house. The front door of the house opened from the room of Mrs. English, in which the homicide occurred. The back door which was on the opposite side of the room opened on to a "walled" passageway which extended straight from the door, on one side of which was the dining-room and on the other side was the room of defendant. Mrs. English, who was introduced as a witness by the State, was not questioned by either side in regard to having been knocked down by the defendant, as mentioned in the first division of this opinion, nor did she testify in reference to any such fact. She testified: "I witnessed that shooting. . . Gordon [the defendant] says he shot him. I saw the flash of the pistol. At the time the shooting took place Gordon had been at the house just a few minutes. . . I told Johnny [the deceased] to go out the front door and go on home, but he didn't do it. Gordon had done gone out the back door and shut the door behind him. When Gordon walked out the back door, Johnny was standing up in front of the fireplace; . . and then is when I had that conversation with Johnny. I had spoken to him several times. I had told him to go on home, not to have any fuss. When he went out the back

door I told Johnny to go out the front door and not have any trouble. He did not go out the front door. · Johnny did not get out the back door; he opened it. When he opened the door the pistol fired. . . He never did get out of the door. As he opened it the pistol fired. I was still talking to Johnny; I told him not to go, and he went on out, and I was so exhausted. Johnny . . said Gordon thought he was scared of him, but he was not, that he would kill him. . . When he [Gordon] walked out he told Johnny not to follow him, but let him alone, he would see him tomorrow. He told him not to follow him; said not to say anything more to him that night. Told him not to follow him, he would see him the next day. . . After Gordon left the room there was nobody left in the room besides me and Johnny. Ruth was gone after Mr. Killebrew [the sheriff], because I sent her for Mr. Killebrew because they was fussing. It was not very long after the shooting before Ruth came back. . . I did not see Johnny Hogan with a pistol. . . When you get out the door the floor continues on level. It is walled on each side of that walkway. . . That walkway before you get down to where there is nothing on the side is as long as the length of the room that Gordon Wilson slept in. If he had been out in the yard on the side anywhere, he could not have seen down that walkway. In order to have seen into that door as this boy started out, he would have had to be in front of this four or five foot walkway. . ." On cross-examination the witness testified: "I had done got excited because I saw there was some difference between Gordon and Johnny. There was enough until Gordon left the fire and went on out the door. He at first told Johnny to go along and wait until to-morrow and it would be all right; tried to get him to go on. I tried to get him to go on. When Gordon went on out the door I still insisted on Johnny not going that way. Johnny said he was going on, that Gordon thought he was afraid of him, but he was not, and that he would kill him. I saw him put his hand back here [indicating]. The further Johnny went the more excited I got, because me and Gordon had both begged him not to go that way; and when he said he would kill him, that excited me more."

The above statement of the evidence is set forth in order that it may be considered with certain alleged newly discovered evidence which is the basis of the sixth ground of the motion for

new trial, namely, testimony of Bunnie E. May, that "Johnnie Hogans, a week or more before he was killed, said to him, Bunnie E. May, that he, Johnnie Hogans, was going to run Gordon Wilson away from Mrs. English's house, and away from the house where Gordon Wilson was boarding." This testimony was substantially a threat, and was not communicated to the defendant before the homicide. In *Vincent* v. *State,* 153 *Ga.* 278 (112 S. E. 120), the following rules of law were pronounced: "Before proof of uncommunicated threats is admissible in defense, there must be evidence tending to show that the deceased was the assailant in the fatal encounter, or did some overt act showing an intention to carry such threats into execution. . . The proper foundation for the admission of uncommunicated threats can not be laid by the defendant's statement alone. . . When the evidence leaves it doubtful as to which of the parties began the mortal combat, and there is testimony tending to show that the slayer killed his adversary in self-defense, or under the influence of reasonable fears and not in a spirit of revenge, evidence of this character is admissible to show the state of mind or feeling on the part of the deceased, and thus illustrate his conduct and throw light upon his intention and purpose." These principles are applicable to the case under consideration. From the statements of the evidence set forth the jury would have been authorized to find that the deceased was an assailant at the time of the mortal combat, and that the defendant acted under the fears of a reasonable man that a felony was about to be committed upon him. There was no evidence that the deceased was armed with a weapon of any kind, but the jury would have been authorized to find that the defendant and the deceased had had a quarrel and that defendant retired to his room by way of the back door to avoid further trouble, and that the deceased, though urged to go to his own home and to leave by going out the front door, persisted in going out the back door, stating more than once and as he approached the door that the defendant "thought he was afraid of him, but he was not, and that he would kill him." If on another trial the evidence should be of this character and the newly discovered evidence should be produced, the jury would be authorized to find that the defendant heard the threats of the deceased as he approached the door, and that the act of the deceased in proceeding to go out of the back

door at the time of making such threats was an overt act indicating an intention to carry into execution the uncommunicated threat to run Gordon Wilson away, and that the defendant shot under the fears of a reasonable man that a felony was about to be committed upon him. Such being the character of the evidence at the trial, the alleged newly discovered evidence as to an uncommunicated threat was admissible to show the intention of the deceased in following the defendant at the time of the homicide, and as tending to support the theory of justification as relied on by the defense. The proper foundation was laid for consideration by the trial judge of the alleged newly discovered evidence; and it was erroneous to overrule the motion for a new trial.

The ruling announced in the fourth headnote does not require elaboration.

*Judgment reversed. All the Justices concur, except Beck, P. J., and Gilbert, J., dissenting.*

GILBERT, J., dissenting. It may be conceded, for present purposes, that the evidence, newly discovered, would have been admissible had it been offered during the trial, though that is doubtful. The threats were uncommunicated, and it is not clear that the deceased was the assailant. Because admissible on the trial, it does not follow that the court erred in refusing a new trial on the ground of such newly discovered evidence. Grants of new trials on the ground of newly discovered evidence are not favored, and a judgment refusing a new trial on such a ground should not be reversed unless the error is manifest. *Carr* v. *State,* 14 *Ga.* 358, is quite similar in facts, though the motion in *Carr's* case was based on extraordinary grounds. In this case the newly discovered evidence is cumulative, and for that reason a refusal of a new trial should not be reversed. BECK, P. J., concurs in this dissent.